GIBSON, DUNN & CRUTCHER LLP
GARETH T. EVANS, SBN 138992
ANDREW Z. EDELSTEIN, SBN 218023
333 South Grand Avenue
Los Angeles, California 90071-3197
Telephone: (213) 229-7000
Facsimile: (213) 229-7520
e-mail: *gevans@gibsondunn.com*

MILBANK, TWEED, HADLEY &
  McCLOY LLP
JAMES N. BENEDICT, *Pro Hac Vice*
SEAN M. MURPHY, *Pro Hac Vice*
C. NEIL GRAY, *Pro Hac Vice*
One Chase Manhattan Plaza
New York, New York 10005-1413
Telephone: (212) 530-5000
Facsimile: (212) 530-5219
e-mail: *jbenedict@milbank.com*

Attorneys for Defendants
The Capital Group Companies, Inc.,
Capital Research and Management Company, and
American Funds Distributors, Inc.

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION

| | |
|---|---|
| In re AMERICAN FUNDS SECURITIES LITIGATION<br><br><br>This document related to:<br><br>ALL ACTIONS | MASTER FILE NO.<br>CV 06-7815 GAF (RNBx)<br><br>**DEFENDANTS' REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN FURTHER SUPPORT OF THEIR MOTION TO DISMISS**<br><br>[Supplemental Declaration of Andrew Z. Edelstein filed concurrently herewith.]<br><br>Judge:     Hon. Gary A. Feess<br>Date:      February 25, 2008<br>Time:      9:30 a.m.<br>Place:     Courtroom 740<br>           255 E. Temple Street<br>           Los Angeles, CA 90012 |

Gibson, Dunn &
Crutcher LLP

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ....................................................................................ii

I.  PRELIMINARY STATEMENT ........................................................................ 1

II.  ARGUMENT.................................................................................................... 2

    A.  THE 1934 ACT CLAIMS MUST BE DISMISSED ................................. 2

        1.  The Complaint Fails To Plead Scienter ........................................... 2

        2.  There Was No Duty to Disclose ...................................................... 6

        3.  Defendants Made Full And Complete Disclosures ....................... 10

        4.  The Challenged Payments Were Not Material ............................. 10

        5.  The Complaint Fails to Plead Reliance ......................................... 13

        6.  The Complaint Fails to Plead Loss Causation.............................. 16

    B.  PLAINTIFFS' 1933 ACT CLAIMS SHOULD BE DISMISSED .......... 18

    C.  PLAINTIFFS' CLAIMS ARE BARRED BY THE APPLICABLE STATUTES OF LIMITATIONS............................................................ 19

        1.  The Filing of *Corbi* Demonstrates Inquiry Notice ....................... 19

        2.  The Limitations Period Was Not Tolled Under *American Pipe* ......................................................................................... 20

    D.  PLAINTIFFS LACK STANDING AS TO THE FUNDS THAT THEY DO NOT OWN.......................................................................... 23

    E.  PLAINTIFFS' CONTROL PERSON CLAIMS MUST BE DISMISSED.................................................................................... 24

III.  CONCLUSION ............................................................................................. 25

# TABLE OF AUTHORITIES

Page(s)

<span style="text-align:center">CASES</span>

*Abell v. Potomac Ins. Co.*,
    858 F.2d 1104 (5th Cir. 1988) .................................................................. 14, 16

*Affiliated Ute Citizens of Utah v. United States*,
    406 U.S. 128 (1972) ...................................................................... 13, 14, 16

*Allee v. Medrano*,
    416 U.S. 802 (1974) .............................................................................. 24

*American Pipe & Constr. Co. v. Utah*,
    414 U.S. 538 (1974) ......................................................................*passim*

*Benak v. Alliance Capital Mgmt., L.P.*,
    349 F. Supp. 2d 882 (D.N.J. 2004) ........................................................ 20

*Benzon v. Morgan Stanley Distribs., Inc.*,
    420 F.3d 598 (6th Cir. 2005) ............................................................. 6, 10

*Binder v. Gillespie*,
    184 F.3d 1059 (9th Cir. 1999) ............................................................... 14

*Brody v. Transitional Hosp. Corp.*,
    280 F.3d 997 (9th Cir. 2002) ................................................................. 10

*Card v. Duker*,
    122 F. App'x 347 (9th Cir. 2005) ..................................................... 20, 21

*Castillo v. Dean Witter Discover & Co.*,
    No. 97 Civ. 1272 (RPP), 1998 U.S. Dist. LEXIS 9489 (S.D.N.Y. June 25,
    1998) ........................................................................................... 6, 17

*Catholic Soc. Servs., Inc. v. INS*,
    232 F.3d 1139 (9th Cir. 2000) ............................................................... 22

*Corbi v. The Capital Group Cos.*,
    No. CV 04-5593 (RNBx) (C.D. Cal. Jul. 15, 2004)........................................*passim*

*Crown, Cork & Seal Co. v. Parker*,
    462 U.S. 345 (1983) .............................................................................. 22

*Donovan v. Skandia Inc. Hldg. Corp.*,
    02 CV 9859 (MP), 2003 U.S. Dist. LEXIS 13129 (S.D.N.Y. July 31, 2003) ........... 9

*Dura Pharms., Inc. v. Broudo*,
    544 U.S. 336 (2005) .............................................................................. 18

Gibson, Dunn &
Crutcher LLP

*Ernst & Ernst v. Hochfelder*,
   425 U.S. 185 (1976) ......................................................................................... 10

*Forsythe v. Sun Life Fin., Inc.*,
   417 F. Supp. 2d 100 (D. Mass. 2006) ............................................................. 24

*In re AIG Advisor Group Sec. Litig.*,
   No. 06 Civ. 1625 (JG), 2007 U.S. Dist. LEXIS 30179 (E.D.N.Y. Apr. 25,
   2007) .............................................................................................. 6, 10, 11, 24

*In re AIG Advisors Group Sec. Litig.*,
   No. 06 Civ. 1625 (JG), 2007 U.S. Dist. LEXIS 69396 (E.D.N.Y. Sept. 20,
   2007) .................................................................................................. 11, 12, 13

*In re Am. Funds Fee Litig.*,
   No. CV 04-5593-GAF (RNBx), 2005 U.S. Dist. LEXIS 41884 (C.D. Cal.
   Dec. 16, 2005) .................................................................................... 22, 23, 24

*In re Daou Sys. Inc.*,
   411 F.3d 1006 (9th Cir. 2005) ......................................................................... 19

*In re Gap Sec. Litig.*,
   No. C-87-4895 JPV, 1988 U.S. Dist. LEXIS 17124 (N.D. Cal. Sept. 28,
   1988) ................................................................................................................ 15

*In re Genesisintermedia, Inc. Secs. Litig.*,
   No. CV01-9024-SVW (VBKx), 2007 U.S. Dist. LEXIS 95253 (C.D. Cal.
   June 28, 2007) ........................................................................................... 14, 15

*In re Infonet Servs. Corp. Sec. Litig.*,
   310 F. Supp. 2d 1106 (C.D. Cal. 2003) ........................................................... 20

*In re Leadis Tech., Inc. Sec. Litig.*,
   No. C-05-00882 CRB, 2006 WL 496039 (N.D. Cal. Mar. 1, 2006) ................ 19

*In re Levi Strauss & Co. Sec. Litig.*,
   No. C-03-05605 RMW, 2007 WL 2694245 (N.D. Cal. Sept. 11, 2007) .......... 19

*In re Merrill Lynch Inv. Mgmt. Funds Secs. Litig.*,
   434 F. Supp. 2d 233 (S.D.N.Y. 2006) .................................................. 6, 12, 13, 17

*In re Morgan Stanley and Van Kampen Mut. Fund Sec. Litig.*,
   No. 03 Civ. 8208 (RO), 2006 WL 1008138  (S.D.N.Y. Apr. 18, 2006) ......... 6, 12, 17

*In re Mutual Funds Inv. Litig.*,
   384 F. Supp. 2d 845 (D. Md. 2005) ................................................................. 18

*In re Prudential Ins. Co. of Am. Sales Practices Litig.*,
   975 F. Supp. 584 (D.N.J. 1996) ....................................................................... 14

Gibson, Dunn &
Crutcher LLP

iii

*In re Salomon Smith Barney Mut. Fund Fees Litig.*,
  441 F. Supp. 2d 579 (S.D.N.Y. 2006) ......................................................... 17, 18, 24

*In re Scudder Mut. Funds Fee Litig.*,
  No. 04 Civ. 1921 (DAB), 2007 WL 2325862 (S.D.N.Y. Aug. 14, 2007) ............... 24

*In re Smith Barney Fund Transfer Agent Litig.*,
  No. 05 Civ. 7583 (WHP), 2007 WL 2809600 (S.D.N.Y. Sept. 26, 2007) ................ 6

*In re Sun Microsys., Inc. Sec. Litig.*, No. C 89 20351 RPA, 1990 U.S. Dist.
  LEXIS 18740 (N.D. Cal. Aug. 20, 1990) ................................................................. 15

*In re Wet Seal, Inc. Sec. Litig.*,
  518 F. Supp. 2d 1148 (C.D. Cal. 2007) ................................................................. 2, 3

*Johnson v. Railway Express*,
  421 U.S. 454 (1975) ................................................................................................ 21

*Joseph v. Wiles*,
  223 F.3d 1155 (10th Cir. 2000) .................................................................... 14, 15, 16

*McPhail v. First Command Fin. Planning, Inc.*,
  05CV179 IEG (JMA), 2007 U.S. Dist. LEXIS 54875 (S.D. Cal. July 30,
  2007) ....................................................................................................................... 14

*Poulos v. Caesars World, Inc.*,
  379 F.3d 654 (9th Cir. 2004) .................................................................................. 14

*Press v. Quick & Reilly*,
  218 F.3d 121 (2d Cir. 2000) ............................................................................... 6, 12

*Robbin v. Fluor Corp.*,
  835 F.2d 213 (9th Cir. 1987) .................................................................................. 21

*Romine v. Acxiom Corp.*,
  296 F.3d 701 (8th Cir. 2002) .................................................................................. 10

*Sheppard v. Capital One Bank*,
  No. CV 06-7535 GAF (FFMx), 2007 U.S. Dist. LEXIS 70061 (C.D. Cal. July
  11, 2007) ....................................................................................................... 21, 22, 23

*Siemers v. Wells Fargo & Co.*,
  No. C 05-04518 WHA, 2006 U.S. Dist. LEXIS 60858 (N.D. Cal. Aug. 14,
  2006) ................................................................................................................ *passim*

*Siemers v. Wells Fargo & Co.*,
  No. C 05-04518 WHA, 2006 U.S. Dist. LEXIS 81097 (N.D. Cal. Oct. 24,
  2006) ......................................................................................................................... 4

Gibson, Dunn &
Crutcher LLP

iv

*Siemers v. Wells Fargo & Co.*,
    No. C 05-04518 WHA, 2007 U.S. Dist. LEXIS 21935 (N.D. Cal. Mar. 9,
    2007)..................................................................................................5, 7, 18

*Siemers v. Wells Fargo & Co.*,
    No. C 05-04518 WHA, 2007 U.S. Dist. LEXIS 31287 (N.D. Cal. April 17,
    2007)..........................................................................................5, 6, 12, 13

*Stegall v. Ladner*,
    394 F. Supp. 2d 358 (D. Mass. 2005) .....................................................24

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    127 S. Ct. 2499 (2007) .......................................................................2, 3, 4

*Verona Partners, LLC v. Tenet Capital Partners Convertible Opportunities
    Fund LP*,
    No. C 05-5369 (PJH), 2006 U.S. Dist. LEXIS 69488 (N.D. Cal. Sept. 18,
    2006)..........................................................................................................16

RULES

17 C.F.R. §§ 239.15A, 274.11A ...........................................................................4, 6, 7

OTHER AUTHORITIES

Brief of the Securities and Exchange Commission as Amicus Curiae, *Press v.
    Quick & Reilly*, No. 97-9159, 2000 WL 34447852 (Feb. 14, 2000) ...........3, 8, 9, 12

*Dep't of Enforcement v. American Funds Distrib., Inc.*,
    CRD No. 6247, NASD Hearing Panel Decision (Aug. 30, 2006) .......................8, 16

*In the Matter of Edward D. Jones & Co., L.P.*,
    Admin. Proc. File No. 3-11780 (SEC Dec. 22, 2004) ...........................................7, 8

NASD Notice to Members 94-14, NASD Clarifies Compensation Disclosure
    Requirements For Mutual Funds In Article III, Section 26 of the NASD Rules
    of Fair Practice (1994)...............................................................................................9

Gibson, Dunn &
Crutcher LLP

v

## MEMORANDUM OF POINTS AND AUTHORITIES

Defendants submit this reply memorandum in support of their motion to dismiss the Consolidated Amended Complaint (the "CAC" or "Complaint").

## I.

## PRELIMINARY STATEMENT

Defendants made payments to broker-dealers to help defray the costs the brokers incurred in connection with efforts to educate their financial advisers about American Funds in order to assist them in selecting appropriate investments for their customers (which Plaintiffs label "revenue sharing"). Up until 2004, Defendants also executed brokerage transactions in the Funds' portfolio securities through brokerage firms whose financial advisers also sold shares of the Funds to their retail clients (which Plaintiffs call "directed brokerage"). Defendants pointed out in their opening brief that both of these practices were lawful and, in some instances, specifically endorsed by the SEC during the relevant time period. Plaintiffs' opposition does not cite any authority challenging the legality of these practices.

Until very recently, so-called "revenue sharing" and "directed brokerage" were commonplace throughout the mutual fund industry. Nevertheless, this case is one of dozens of class actions filed by the same handful of plaintiffs' counsel against different advisers across the country complaining about the manner in which these practices were disclosed. All of these other cases, which involved very similar fact patterns, have been dismissed for failure to state a cause of action, except one.

Plaintiffs ignore the overwhelming weight of authority finding that nearly identical claims to those Plaintiffs assert here could not survive a motion to dismiss. Instead, Plaintiffs rely on the only case to sustain a revenue sharing complaint, *Siemers v. Wells Fargo & Co.*, No. C 05-04518 WHA, 2006 U.S. Dist. LEXIS 60858 (N.D. Cal. Aug. 14, 2006), even though it was based on different facts. Grossly mischaracterizing *Siemers* as "the leading case on the matter," Plaintiffs ignore the

Gibson, Dunn &
Crutcher LLP

fact that it is inconsistent with many other cases directly on point.  (*See* Supplemental Declaration of Andrew Z. Edelstein ("Edelstein Supp. Decl.") Ex. A (a chart comparing *Siemers* to other decisions on issues relevant to this motion).)  For the reasons stated herein, this Court should follow the overwhelming weight of authority which holds that the same allegations in this Complaint do not state a cause of action.

## II.

## ARGUMENT

### A.   THE 1934 ACT CLAIMS MUST BE DISMISSED

#### 1.   The Complaint Fails To Plead Scienter

In June 2007, the Supreme Court clarified the standard for pleading scienter. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499 (2007).  In *Tellabs*, the Court held that a complaint will survive "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* at 2510.  Plaintiffs must "plead, at a minimum, particular facts giving rise to a ***strong inference of deliberate or conscious recklessness*.**" *In re Wet Seal, Inc. Sec. Litig.*, 518 F. Supp. 2d 1148, 1157 (C.D. Cal. 2007) (Feess, J.) (emphasis in original).  "The requirement of a 'strong' inference of scienter means that the 'the court must consider all reasonable inferences to be drawn from the allegations, including inferences unfavorable to the plaintiffs.'" *Id.* (citation omitted).

Plaintiffs misapprehend the nature of the scienter requirement, arguing that they can establish scienter by alleging that Defendants must have known they were making payments to brokers or engaging in directed brokerage.  (*See* Plaintiffs' Opposition ("Opp.") at 7.)  That, of course, does not establish scienter, particularly since the practices themselves were unquestionably lawful.  Rather, the issue is whether there are any facts alleged with particularity which demonstrate a cogent and compelling inference that Defendants embarked on a knowing (or reckless) scheme to deceive

2

Fund investors.  There are none.  Plaintiffs cannot point to a single fact indicating that Defendants acted with the requisite intent.  (*See* Opp. at 5-7.)

Moreover, *Tellabs* requires an analysis of the various competing inferences to be drawn from the alleged facts, and Plaintiffs' inference of scienter must be "at least as compelling" as opposing inferences.  *Tellabs*, 127 S. Ct. at 2510.  Here, the inferences against a finding of scienter are far more compelling than those for such a finding.  Defendants maintain that the challenged revenue sharing payments were designed for a benign commercial motive—to educate brokers about the attributes of American Funds to assist them in making suitable recommendations to their customers.  Moreover, with respect to directed brokerage, it is clear that Defendants' objective was to execute trades of the Funds' portfolio securities.  Plaintiffs have simply failed to allege any facts that undermine these reasonable inferences, and where a defendant's motive is a "normal business objective," it "cannot by itself establish scienter."  *See In re Wet Seal*, 518 F. Supp. 2d at 1174.

With respect to disclosure of these practices, the <u>only</u> compelling inference is that Defendants did not attempt to deliberately mislead the Funds' shareholders about revenue sharing payments or directed brokerage.  Indeed, Defendants did not mislead them at all, as Plaintiffs cannot dispute that the existence of these practices was disclosed in the Funds' Prospectuses and Statements of Additional Information ("SAIs").  These facts do not support an inference of a nefarious scheme to conceal revenue sharing and directed brokerage.  To the contrary, the Funds' disclosures at the time complied with what guidance existed from the SEC on directed brokerage and revenue sharing.[1]  In addition to the SEC, almost every court to have examined the

---

[1]  In its *amicus* brief in *Press v. Quick & Reilly*, the SEC repeatedly acknowledged that it had failed to provide guidance on the requirements for disclosures regarding revenue sharing.  *See* Brief of the SEC, *Press v. Quick & Reilly*, 218 F.3d 121, 2000 WL 34447852 (Feb. 14, 2000) at *6, 11, 21, 27.  Plaintiffs, however, offer no explanation for how Defendants could have acted with scienter when the SEC itself

Gibson, Dunn & Crutcher LLP

issue has held that an adviser is not required to make any disclosures about revenue sharing under Form N-1A, 17 C.F.R. §§ 239.15A and 274.11A, or other statutes. (*See* Br. at 7 & n.3.) Given these pronouncements about what disclosure was required, all of which Defendants adhered to, Plaintiffs have failed to allege facts giving rise to a compelling inference that Defendants acted intentionally to deceive fund shareholders.

Plaintiffs' reliance on *Siemers,* 2006 U.S. Dist. LEXIS 60858, is misplaced. In that case, the court noted that the scienter allegations were deficient with respect to each defendant individually.[2] As a result, after the filing of an amended complaint, the *Siemers* court revisited the scienter issue in three later decisions with differing results.[3] Two months after the decision upon which Plaintiffs rely, Judge Alsup dismissed the Section 10(b) claim against the Wells Fargo investment adviser and distributor, finding that "the second amended complaint falls short of alleging, in 'great detail, facts that constitute strong circumstantial evidence of deliberately reckless or conscious misconduct' on behalf of [these defendants]." *Siemers v. Wells Fargo & Co.*, No. C 05-04518 WHA, 2006 U.S. Dist. LEXIS 81097, at *37 (N.D.

---

acknowledged that it did not require disclosure of any more specific information or provide adequate guidance on broker compensation disclosures. *Id.* at *12, 27-28.

[2] *Siemers*, 2006 U.S. Dist. LEXIS 60858, at *27 n.3 ("Not all defendants may have had such an intent or recklessness. Movants, however, do not make defendant-specific challenges to the scienter allegations. The Court declines to do so for them.")

[3] Indeed, the first *Siemers* decision relied on by Plaintiffs is the least compelling authority because it was decided before, and appears inconsistent with, the Supreme Court's decision in *Tellabs*. For example, the *Siemers* court describes two competing inferences regarding the defendants' use of revenue sharing payments: "In one view, the trust's investment advisers and fund distributors merely bought 'shelf-space' for their products in retail brokerages, much as a cereal manufacturer pays a grocery chain for placement of corn flakes at shoppers' eye level. In another view, they paid kickbacks." *Siemers*, 2006 U.S. Dist. LEXIS 60858, at * 3. Yet the court simply accepts the inference to be drawn from plaintiffs' spin of the facts and never addresses defendants' competing inference that the payments were for a legitimate business purpose, as *Tellabs* requires.

4

Cal. Oct. 24, 2006).  After another amended complaint attempting to cure these defects, the court again re-examined the scienter allegations.  In that opinion, the court found that the case could proceed "subject to the vetting of a *revised*" complaint that bolstered the scienter allegations.  Specifically, the court stated:

> Before a final decision on whether to allow a Section 10 claim, this order requires that the proposed pleading be revised to set forth plaintiffs' best case as to all elements, taking nothing for granted.  For example, it should, as to each of the five Wells Fargo funds, . . . <u>set forth the best case as to scienter by the sponsors</u>, among all other Section 10 elements.

*Siemers v. Wells Fargo & Co.*, No. C 05-04518 WHA, 2007 U.S. Dist. LEXIS 21935, at *47-48 (N.D. Cal. Mar. 9, 2007) (emphasis added).

Finally, after the filing of yet another amended complaint, the court found the scienter allegations to be sufficient.  *Siemers v. Wells Fargo & Co.*, No. C 05-04518 WHA, 2007 U.S. Dist. LEXIS 31287 (N.D. Cal. April 17, 2007).  However, Plaintiffs do not rely on this decision for their scienter arguments, and for good reason.  The court's holding hinged on two crucial aspects of defendants' disclosures that it found supported an inference of scienter—both of which are lacking here.  First, defendants' disclosures stated that revenue sharing payments "may" be made, "when in fact they were a certainty."  *Id.* at *33.  Second, defendants inexplicably disclosed the revenue sharing payments under the heading "Minimum Investments" in the Prospectus, and thereby "buried [the disclosure] in unexpected placements indicat[ing] that they knew of its significance, yet chose to mislead."  *Id.* at *37.  Neither of these facts, which form the primary basis for Judge Alsup's finding of scienter, is present in this case.  Here, Defendants' SAIs included a section prominently labeled "OTHER COMPENSATION TO DEALERS," and disclosed that Defendants "<u>currently provide</u> additional compensation to dealers."  (*See* May 1, 2003 SAI, Edelstein Decl. (Docket No. 49) at Ex. H.)  Thus, *Siemers* is clearly inapposite.

5

Even if the facts in *Siemers* were not totally distinguishable, its holding should be rejected in favor of the better reasoned body of precedent finding no scienter on facts nearly identical to this case.  *See, e.g., In re Morgan Stanley and Van Kampen Mut. Fund Sec. Litig.*, No. 03 Civ. 8208 (RO), 2006 WL 1008138, at *10 (S.D.N.Y. Apr. 18, 2006); *Castillo v. Dean Witter Discover & Co.*, No. 97 Civ. 1272 (RPP), 1998 U.S. Dist. LEXIS 9489, at *32 (S.D.N.Y. June 25, 1998).[4]  Where defendants complied with the law and fully disclosed all required information, as Defendants did here, *see* Br. at 11-12, "defendants could not possess the required intent or recklessness."  *In re Morgan Stanley*, 2006 WL 1008138, at *11.

## 2.    There Was No Duty to Disclose

SEC Form N-1A does not require a fund prospectus to disclose the details of revenue sharing that Plaintiffs claim should have been disclosed in this case.  At least seven courts have so held on nearly identical facts to those presented here.[5]

Plaintiffs specifically attempt to establish a duty to disclose pursuant to Item 15(c) of Form N-1A.  Item 15 applies only to directed brokerage, not revenue sharing.  *In re Morgan Stanley*, 2006 WL 1008138, at *7 n.13 (Item 15 "requires that the compensation to brokers who execute portfolio transactions of securities owned by the

---

[4]  Plaintiffs' suggestion that these cases are not on point because they "focused on broker-dealers instead of the mutual fund companies" (Opp. at 8 n. 9), is simply wrong.  These cases involved disclosures in mutual fund prospectuses and many of the defendants were in fact mutual fund advisers.  *See, e.g., In re Morgan Stanley*, 2006 WL 1008138, at *1-3.  They are directly on point.

[5]  *See*, *e.g., Benzon v. Morgan Stanley Distribs., Inc.*, 420 F.3d 598, 612 (6th Cir. 2005) ("SEC regulations, including Form N-1A, do not impose a disclosure obligation with respect to broker compensation"); *Press v. Quick & Reilly, Inc.*, 218 F.3d 121 (2d Cir. 2000); *In re AIG Advisor Group Sec. Litig.*, No. 06 Civ. 1625 (JG), 2007 U.S. Dist. LEXIS 30179, at *28 (E.D.N.Y. Apr. 25, 2007); *In re Morgan Stanley*, 2006 WL 1008138, at *7; *In re Merrill Lynch Inv. Mgmt. Funds Secs. Litig.*, 434 F. Supp. 2d 233 (S.D.N.Y. 2006); *Castillo*, 1998 U.S. Dist. LEXIS 9489; *In re Smith Barney Fund Transfer Agent Litig.*, No. 05 Civ. 7583 (WHP), 2007 WL 2809600, at *3 (S.D.N.Y. Sept. 26, 2007).

Gibson, Dunn & Crutcher LLP

fund be disclosed—not compensation to the *retail* brokers, or Financial Advisors, who sell shares of the fund.") (emphasis in original).  With respect to that practice, Defendants' disclosures expressly comply with Item 15(c) by disclosing how the adviser selects brokers to execute securities transactions for the Funds.[6]  Plaintiffs offer no theory to the contrary.

Plaintiffs also argue that Defendants must have failed to satisfy Form N-1A because "the American Funds' Prospectuses and accompanying SAIs contained the **exact** language that the SEC determined in the SEC enforcement actions against Edward Jones to be inadequate."  (Opp. at 12 (emphasis in original).)  Plaintiffs offer no cite for this outlandish claim, and a review of the *Edward Jones* consent order (the "Order") reveals this assertion to be patently false.  *See In the Matter of Edward D. Jones & Co., L.P.*, Admin. Proc. File No. 3-11780 (SEC Dec. 22, 2004) (*See* Edelstein Supp. Decl. Ex. B).  First, the subject of that consent order was **broker-dealer** disclosure obligations, which are different from those of an investment adviser.[7]  Second, Plaintiffs selectively cite *dicta* from that decision, *i.e.*, "Many of the Preferred Families' prospectuses and SAIs fail to disclose adequate information about the source and the amount of the revenue sharing payments to Edward Jones."  (Opp. at n.12 (emphasis added).)  This statement by the SEC was in response to Edward Jones' argument that it could "rely on language contained in the Preferred Families prospectuses and SAIs to disclose revenue sharing payments," rather than making any

---

[6]  *See* CAC ¶ 95 (citing the Prospectus disclosure on how the adviser selects broker-dealers to execute fund transactions and the factors it considers in making those selections.)

[7]  As even the *Siemers* court recognized, "[a]t the broker level, the revenue sharing agreements created a different conflict of interest."  *Siemers*, 2007 U.S. Dist. LEXIS 21935, at *6.  Broker-dealers directly interface with investors, many of whom come to the broker for neutral professional investment advice.  On the other hand, mutual fund investment advisers have an obvious interest in selling their proprietary funds over competitive funds.

7

disclosures about its own revenue sharing initiatives.[8]  *Edward Jones*, ¶ 20.  More importantly, Plaintiffs misleadingly omit the key word (*i.e.*, "many") in the SEC's statement which makes clear that the SEC did not believe all of the fund complexes that had arrangements with Edward Jones had inadequate disclosures.  There is no support for Plaintiffs' false assumption that American Funds was one of the families whose disclosures the SEC believed was lacking.  Contrary to Plaintiffs' suggestion, there is absolutely nothing in the Order that comments or opines on any disclosures similar to those made by Defendants.[9]  In fact, the Defendants are not even mentioned in the Order.[10]

　　　　To the extent the SEC's view of American Funds' disclosures can be discerned, it is not from the *Edward Jones* order, but rather from the SEC's direct interactions with Defendants.  In 2004, the SEC did investigate Defendants' payments to brokers and related disclosures.  After reviewing the very practices and disclosures cited in the

---

[8]  As American Funds are sold through hundred of brokers, the prospectus simply cannot describe the details of each relationship, particularly since the document must be published in advance of any sale.  *See* Brief for the SEC, at *11, *Press v. Quick & Reilly*, 218 F.3d 121 (2d Cir. 2000).

[9]  Finally, it is worth noting that Defendants were not parties to the *Edward Jones* proceeding and therefore the decision does not make *any* findings relating to Defendants.  As the consent order makes clear, the "findings [t]herein are not binding on any other person or entity in this or any other proceeding."  *Edward Jones*, at n.1.

[10]  Plaintiffs' assertion that the NASD concluded that Defendants did not adequately disclose revenue sharing (*see* Opp. at 12 & n.13), also is a gross mischaracterization.  The NASD investigation did not involve fund disclosures or revenue sharing in any way.  Rather, the NASD hearing involved a question of first impression regarding a NASD rule that permitted its members, subject to best execution rules, to consider sales by brokers when selecting these brokers to execute the members' trades.  Although the NASD imposed a relatively minor $5 million fine for the technical violation, it specifically found ***no harm to shareholders***.  *Dep't of Enforcement v. American Funds Distrib., Inc.*, CRD No. 6247, NASD Hearing Panel Decision, at 24-26 (Aug. 30, 2006) (*See* Edelstein Supp. Decl. Ex. C).  There was no finding or even discussion about the Defendants' disclosures, and the NASD hearing has no bearing on this case.

8

Gibson, Dunn & Crutcher LLP

Complaint, <u>the SEC **dropped**</u> its investigation of Defendants without taking any action or making any adverse findings.[11]   Moreover, prior to 2003, the SEC's position on the adequacy of revenue sharing disclosures in mutual fund prospectuses like Defendants' is perhaps best articulated in the *amicus* brief it filed in *Press v. Quick & Reilly*.   *See* Brief of the SEC, *Press v. Quick & Reilly*, 2000 WL 34447852 (Feb. 14, 2000) (hereinafter "SEC Brief").   There, the SEC acknowledged the absence of any guidance to investment advisers regarding fund disclosures about revenue sharing, and in that context stated that "we believe that the prospectus disclosure here—that 'significant amounts' of [revenue sharing payments] were paid—was sufficient."   *Id.* at *27-28. In the view of the SEC, "this language does more than disclose the mere existence of a conflict and gives some idea of the dimensions of the conflict."   *Id.* at *28.

Plaintiffs also argue that Defendants had a statutory duty to disclose under NASD Notice to Members 94-14, NASD Clarifies Compensation Disclosure Requirements For Mutual Funds In Article III, Section 26 of the NASD Rules of Fair Practice (1994).   However, it is well-settled that "[n]o duty of disclosure will arise directly from a NASD notice."   *Donovan v. Skandia Inc. Hldg. Corp.*, 02 CV 9859 (MP), 2003 U.S. Dist. LEXIS 13129, at *4 (S.D.N.Y. July 31, 2003) (citations omitted).   "NASD notices … are not law and noncompliance therewith cannot itself constitute a violation of the federal securities laws."   *Id.*[12]

Finally, Plaintiffs argue that where Defendants "chose to speak" they had a duty "to speak fully."   (Opp. at 9, 12-13.)   Plaintiffs misconstrue the law.   For example,

---

[11]   *See* Edelstein Decl. Exhibit D (Letter from Andrew G. Petillon, Associate Regional Director, Securities and Exchange Commission, to Seth Schwartz, Esq., Counsel to Capital Research (Oct. 5, 2007)).

[12]   Even if NASD Notices could give rise to a duty to disclose, the plain language of Notice 94-14 clearly does not regulate prospectus disclosure.   Rather, it prohibits a broker-dealer from receiving any compensation unless it is disclosed.   That is, it regulates the broker's receipt of compensation, not the adviser's duty to disclose such compensation.

Gibson, Dunn & Crutcher LLP

their reliance on *Brody v. Transitional Hosp. Corp.*, 280 F.3d 997 (9th Cir. 2002), is entirely misplaced.  (Opp. at 9 n.10.)  Plaintiffs omit a multi-paragraph exegesis by the *Brody* court on the inactionability of incomplete statements.  The court rejected appellants' assertion that "in order for a statement not to be misleading, 'once a disclosure is made, there is a duty to make it complete and accurate.'"  *Brody*, 280 F.3d at 1006.[13]

### 3.     Defendants Made Full And Complete Disclosures

Plaintiffs' opposition does not address the section of Defendants' opening brief which laid out the manner in which Defendants disclosed the challenged practices. (*See* Br. at 11-12.)  For example, Plaintiffs never address the detailed disclosures that were ignored in their Complaint, such as the disclosures that identify every broker to whom Defendants expect to pay additional compensation.  *Id.* at 12 & n.9.  Plaintiffs' silence on Defendants' actual disclosures is telling, as they cannot dispute that these statements were at least sufficient to put investors on notice of these practices.  *See In re AIG Advisor Group Sec. Litig.*, 2007 U.S. Dist. LEXIS 30179, at *28; *Benzon*, 420 F.3d at 612.

### 4.     The Challenged Payments Were Not Material

In order to establish the materiality of the revenue sharing payments and the practice of directed brokerage, the Complaint must provide some indication that the amounts at issue were significant enough on an individual shareholder account or per transaction basis to have altered the total mix of information available.[14]  *See In re*

---

[13]  The other cases cited by Plaintiffs are similarly inapposite.  In *Romine v. Acxiom Corp.*, for example, the Eighth Circuit affirmed the dismissal of a 1933 Act claim, rejecting all of the appellant's claims of inadequate disclosure.  296 F.3d 701, 708-09 (8th Cir. 2002).  *Ernst & Ernst v. Hochfelder*, 425 U.S. 185 (1976), does not contain the language Plaintiffs quoted, and in any event does not relate to the duty to disclose.

[14]  Plaintiffs strangely counter that "Defendants cite no authority" for this proposition. (Opp. at 14.)  But Defendants clearly cite to *In re AIG Advisors Group Sec. Litig.*,

Gibson, Dunn &
Crutcher LLP

*AIG*, 2007 U.S. Dist. LEXIS 30179, at *8 (holding that aggregate figures "covering thousands of transactions brokered by thousands of financial advisors with funds in which plaintiffs did not purchase interests . . . are far too generalized to specifically allege bias on the part of the financial advisors who deal with the plaintiffs in this case").  Plaintiffs' allegation that Defendants' revenue sharing and directed brokerage practices led to $450 million in payments to many dozens of broker dealer firms over a five year period (Opp. at 14-15)[15] is simply insufficient to allege materiality.  When these costs are viewed on a per shareholder or per transaction basis, the lack of materiality is immediately apparent.  For example, the American Funds have over 40 million shareholder accounts today.  *See* The Investment Company of America Annual Report, at 34 (2006) (Edelstein Supp. Decl. Ex. E).  Thus, even accepting Plaintiffs' allegations as true that the revenue sharing payments somehow came out of the shareholders' pockets rather than out of Defendants' profits, these payments merely equate on average to less than $1.50 for each fund shareholder account per year.[16]  *See In re AIG,* 2007 U.S. Dist. LEXIS 69396, at *12 (holding that knowing "financial advisors stood to gain $25 from convincing a particular investor to buy" shares would not have been substantially likely to have altered the total mix of

---

No. 06 Civ. 1625 (JG), 2007 U.S. Dist. LEXIS 69396 (E.D.N.Y. Sept. 20, 2007).  (*See* Br. at 10-11.)

[15]  According to the Complaint, the $450 million figure is allegedly comprised of $294 million in revenue sharing payments (CAC ¶ 37) and $132 million in directed brokerage (CAC ¶ 37).  Obviously, including directed brokerage greatly overstates the amount at issue, as that $132 million for directed brokerage was in exchange for trade execution services on many thousands of transactions involving securities in the Funds' underlying portfolios.  These execution services clearly had significant value and benefited the Funds.

[16]  The per shareholder account calculation is arrived at by dividing the total revenue sharing payments of $294 million by 40 million shareholder accounts (which equals $7.35 per shareholder account), and dividing that by the number of years over which the payments were made (five years).  This translates into $1.47 per shareholder account.

11

information available).  In fact, although Plaintiffs ignore the disclosure, the Defendants' prospectuses disclosed that the aggregate revenue sharing payments did not exceed 0.02% of the total assets in American Funds in a given year.  *See* The Investment Company of America, Prospectus, at 26 (March 1, 2004) (Edelstein Supp. Decl. Ex. F).  Thus, for a company like Capital Research that had as much as almost $1 trillion dollars in assets under management during the Class Period, these fees were not material.

*Press v. Quick & Reilly*, 218 F.3d 121 (2d Cir. 2000) is also instructive.  There, the Second Circuit evaluated the adequacy under Rule 10b-10 of disclosures which were very similar to the disclosures at issue in this case.  *Id.* at 124-25.  The SEC in its amicus brief concluded that "the defendants' Rule 10b-10 obligation to disclose third-party remuneration" are satisfied by the general disclosures made in the fund prospectuses and SAIs.  SEC Brief at *24.  Relying on this conclusion, the Second Circuit held that more specific information about the amount of these payments and the identity of the brokers who received the payments was immaterial.  *Press*, 218 F.3d at 131-32.

Plaintiffs rely exclusively on *Siemers*, 2007 U.S. Dist. LEXIS 31287, which Defendants submit was wrongly decided and contrary to the overwhelming weight of authority on this issue.  *See, e.g., AIG*, 2007 U.S. Dist. LEXIS 69396, at *5, 8; *Press*, 218 F.3d at 130-32; *Morgan Stanley*, 2006 WL 1008138, at *7-8 (payments were not material because they were of "minimal value" and had "minimal impact" on broker compensation); *Merrill Lynch*, 434 F. Supp. 2d at 238 (granting motion to dismiss where plaintiffs "describe only minimal, immaterial payments").  Plaintiffs argue that all of these cases finding no materiality are distinguishable because the amount of money at issue in this case was "astronomical."[17]  (Opp. at 15.)  However, there is

---

[17]  Plaintiffs claim that the *Siemers* court found "far less" revenue sharing payments to be material because the total payments in that case were only $358 million.  First, *Siemers* involved only revenue sharing, and the revenue sharing payments in that case

12

simply no basis for this claim, as the amounts at issue here were actually smaller on a per shareholder account basis, which is what matters in assessing materiality, than those at issue in *Siemers* and other cases. [18]

### 5.      The Complaint Fails to Plead Reliance

Recognizing that the fraud on the market theory cannot apply here, Plaintiffs attempt to establish reliance by asserting the *Affiliated Ute* presumption.[19]  (*See* Opp. at 15 (citing *Affiliated Ute Citizens of Utah v. United States,* 406 U.S. 128, 155 (1972)).)  Plaintiffs' attempt fails.

The *Affiliated Ute* presumption applies only in cases where the complaint involves *primarily* omissions.  *Poulos v. Caesars World, Inc.*, 379 F.3d 654, 666 (9th Cir. 2004) ("[T]he presumption applies only in cases primarily involving 'a failure to disclose'—that is, cases based on omissions as opposed to affirmative misrepresentations"); *Binder v. Gillespie*, 184 F.3d 1059, 1064 (9th Cir. 1999)

---

($358 million) were higher than the $294 million alleged here.  (CAC ¶ 37.)  Second, even using the alleged $450 million number (which is artificially inflated because it includes $132 million in directed brokerage for trade execution services, *see* note 15, *supra*), the American Funds are well over ten times the size of Wells Fargo in terms of assets under management.  *See* Wells Fargo & Co., Annual Report, at 6 (2003) (Edelstein Supp. Decl. Ex. G).  This only underscores why it is important to look at what these amounts translate into on an individual shareholder account basis.

[18]  *Compare AIG*, 2007 U.S. Dist. LEXIS 69396, at *10 (plaintiffs alleged revenue-sharing payments of "up to a 0.25% (*i.e.*, 25 basis points) charge on the sales of shares," and "[q]uarterly fees, of up to 0.11% (*i.e.*, 11 basis points) per year, of the amount of assets under management") *with* The Investment Company of America, Prospectus, at 25 (Mar. 1, 2004) (Edelstein Supp. Decl. Ex. F). ("The level of payments made to qualifying dealers in any given year will vary and in no case would exceed the sum of (a) .10% of the previous year's fund sales by that dealer and (b) .02% of assets attributable to that dealer.")

[19]  Plaintiffs relegate their fraud on the market argument to a footnote.  Even there, the only two cases cited by Plaintiffs, purportedly in support of their conclusion that fraud on the market applies here, did not involve mutual funds and therefore are not relevant.  (*See* Opp. at 16 n.14.)

13

Gibson, Dunn &
Crutcher LLP

(holding that presumption "should be confined to cases that primarily allege omissions").  Because this case involves *mixed* allegations of omissions and misrepresentations, Plaintiffs cannot rely on the *Affiliated Ute* presumption.  *Binder*, 184 F.3d at 1064; *In re Genesisintermedia, Inc. Secs. Litig.,* No. CV01-9024-SVW (VBKx), 2007 U.S. Dist. LEXIS 95253, at *20 (C.D. Cal. June 28, 2007) (holding that where a complaint asserted omissions as well as affirmative misrepresentations, *Affiliated Ute* does not apply).

While "there is often a fine line between" omissions and affirmative misrepresentations, *Poulos*, 379 F.3d at 667, "[c]ourts have repeatedly rejected … attempts" such as Plaintiffs' here "to bring their claims under the presumption of reliance set forth in [*Affiliated Ute*] by alleging omissions that were really only the converse of affirmative misrepresentations."  *In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 975 F. Supp. 584, 606 n.18 (D.N.J. 1996) (collecting cases); *McPhail v. First Command Fin. Planning, Inc.*, 05CV179 IEG (JMA), 2007 U.S. Dist. LEXIS 54875, at *49 (S.D. Cal. July 30, 2007) (holding claims were not based primarily on omissions where "the purported omission is simply the failure to disclose that the allegedly misleading fact was untrue").[20]  A close examination of the Complaint reveals that the so-called omissions are not omissions at all.  For example, the following are some of the most oft-cited "omissions" and why they are in reality allegations that Defendants' disclosures were misrepresentations.

- Disclosures about maximum 12b-1 payments were misleading because they "state that improperly paid marketing services will be subject to the 12b-1 cap, but do[es] not disclose that, in fact, they were not."  (*See, e.g.*, CAC ¶ 98.)

---

[20]  *See also Joseph v. Wiles,* 223 F.3d 1155, 1162 (10th Cir. 2000) (finding that because "an artfully-pleaded complaint can recharacterize as an omission conduct which more closely resembles a misrepresentation," courts must "look to the nature of the allegations contained in the complaint")); *Abell v. Potomac Ins. Co.,* 858 F.2d 1104, 1119 (5th Cir. 1988), *rev'd on other grounds sub nom. Fryar v. Abell*, 109 S. Ct. 3236 (1989) (holding that plaintiffs cannot recast their allegations as omissions to benefit from *Affiliated Ute*).

14

Gibson, Dunn & Crutcher LLP

Obviously, an allegation that a defendant disclosed a fact that was not true is a misrepresentation, not an omission to tell the truth.  To hold otherwise would convert every misrepresentation claim into an omission claim.

- Disclosures about Rule 12b-1 plan were misleading because "Defendants did not comply with Rule 12b-1."  (CAC ¶ 70.)  This is a misrepresentation claim, and Plaintiffs cannot convert this into an omission by alleging Defendants should have disclosed they violated the law.[21]

- Disclosure that Defendants gave preference to brokers selling fund shares when selecting brokers to execute trades as long as the brokers were "in a position to obtain best execution"  (CAC ¶ 61) was misleading because Defendants "failed to disclose" that they directed trades to "brokers who did not offer the best price or execution terms."  (CAC ¶ 62.)  This, too, is simply a misrepresentation claim styled as a failure to disclose the truth.

- Multiple disclosures "acted to conceal from the investing public the true nature" of the revenue sharing programs.  (CAC ¶ 70.)  But when a disclosure "acts to conceal" the true nature of the conduct, it is a misrepresentation.[22]

The same allegations detailed above, all of which Plaintiffs attempt to disguise as omissions, pervade the Complaint.  (*See, e.g., CAC ¶¶* 60, 70, 79, 88, 98, 108 (repeating the misrepresentation about Rule 12b-1 fees); CAC ¶¶ 53, 60, 62, 70, 79, 88, 92, 98, 108, 113 (repeating the misrepresentation about directed brokerage).)

---

[21]  *In re Sun Microsys., Inc. Sec. Litig.*, No. C 89 20351 RPA, 1990 U.S. Dist. LEXIS 18740, at *13 (N.D. Cal. Aug. 20, 1990) (citation omitted) (holding that the defendant was under no duty to "characterize the basic underlying facts with pejorative descriptions or verbalize all adverse inferences expressly"); *In re Gap Sec. Litig.*, No. C-87-4895 JPV, 1988 U.S. Dist. LEXIS 17124, at *6 (N.D. Cal. Sept. 28, 1988) (where material facts are disclosed, there is no duty to characterize those facts with "pejorative nouns and adjectives").

[22]  *See Joseph*, 223 F.3d at 1163 ("Any fraudulent scheme requires some degree of concealment, both of the truth and of the scheme itself. We cannot allow the mere fact of this concealment to transform the alleged malfeasance into an omission rather than an affirmative act."); *see also In re Genesisintermedia*, 2007 U.S. Dist. LEXIS 95253, at *20 n.7) ("It is doubtful whether the failure to disclose an entire scheme should be characterized as an omission because such a characterization would transform every manipulation case into an omissions case").

15

Gibson, Dunn & Crutcher LLP

Here, Plaintiffs cannot avail themselves of the *Affiliated Ute* presumption simply by calling what are essentially misrepresentations, omissions. *See Joseph,* 223 F.3d at 1162 (finding that "labels by themselves . . . are of little help"); *Abell,* 858 F.2d at 1119.

### 6. The Complaint Fails to Plead Loss Causation

To survive a motion to dismiss, "a plaintiff must allege an economic loss, and must plead facts showing a causal connection between the alleged misrepresentation and the economic loss." *Verona Partners, LLC v. Tenet Capital Partners Convertible Opportunities Fund LP*, No. C 05-5369 (PJH), 2006 U.S. Dist. LEXIS 69488, at *37 (N.D. Cal. Sept. 18, 2006). Plaintiffs' allegation—that they paid management fees that covered revenue sharing—fails to meet this requirement.[23]

Even assuming Plaintiffs' dubious claim that the Funds' management fees were improperly inflated was true, loss causation is still lacking.[24] Here, there is no dispute

---

[23] The arguments in Plaintiffs' opposition brief focus only on revenue sharing, and offer no theory as to how the allegations about directed brokerage could possibly have established loss causation. However, it is worth noting that the NASD hearing panel found that there was no harm to shareholders from the challenged conduct. *Dep't of Enforcement v. American Funds Distrib., Inc.*, CRD No. 6247, NASD Hearing Panel Decision (Aug. 30, 2006) (Edelstein Supp. Decl. Ex. C) ("[T]here is simply no evidence that the total amount of brokerage CRMC directed to satisfy the execution revenue targets set by AFD . . . represents unjust enrichment to CRMC or AFD at the expense of the Funds' shareholders.").

[24] Defendants' management fees are among the lowest in the industry. Aaron Pressman, *No Longer Chasing the Lead Horse*, BusinessWeek, June 26, 2006, at 92 (noting that American Funds are "[c]haracterized by . . . lower-than-average fees"); Ilana Polyak, *The Boy Scouts of Mutual Funds*, SmartMoney, May 2004, at 28 (noting that investors in American Funds are "rewarded with low annual fees"); Timothy Middleton, *Funds that Earn You Less and Cost You More*, CNBC.com, May 14, 2002 (ranking American Funds as the second-best fund company because it "tended to take the least risk, *have the lowest expenses* and the highest gross returns"); Jonathan Burton, *Lean, Mean Money Machines*: *Mutual Funds with Low Expenses Beat Up the Competition in Every Asset Category*, Bloomberg Personal Finance, July-Aug. 1999, at 76-77 (American Funds "are priced well below average") (Edelstein Supp. Decl.

that <u>the total fees paid by shareholders were fully disclosed</u> in the Prospectus, and shareholders did not pay any fees over and above the amount disclosed.  Under these circumstances, Plaintiffs' allegation that a failure to disclose that some of the fee was improperly allocated to cover payments to brokers does not have a causal connection to any economic loss.[25]  *See In re Salomon Smith Barney Mut. Fund Fees Litig.*, 441 F. Supp. 2d. 579, 590 (S.D.N.Y. 2006) ("where Defendants at all times disclosed the total fees in the Fund Prospectuses, allocation of fees would not affect mutual fund share value"); *Merrill Lynch*, 434 F. Supp. 2d at 238 ("The fees charged to shareholders, which were disclosed, do not constitute a 'loss'); *Morgan Stanley*, 2006 WL 1008138, at *9 (where all shareholder fees were disclosed in the prospectuses, "[t]he allocation of the fees is immaterial, because it could have no effect on share price"); *Castillo*, 1998 U.S. Dist. LEXIS 9489, at *15 ("[T]he allocation of fees would not affect the damages for the losses claimed by plaintiffs.  It is the total fees charged that would affect the asset value of a mutual fund and the decision to invest.  The prospectuses disclosed these amounts.").

Plaintiffs' reliance on *Siemers* is again misplaced.  There, the court based its finding that loss causation existed on plaintiffs' allegation that the fees were "secret," *Siemers*, 2006 U.S. Dist. LEXIS 60858, at *34, and "[t]he true price of admission to the fund was greater than was represented."  *Siemers*, 2007 U.S. Dist. LEXIS 21935, at *46.  But Defendants here disclosed the total fees paid by shareholders, and thus Plaintiffs were not misled about the "true price of admission to the fund."  Plaintiffs here do not—and cannot—claim that shareholders paid any fees as a result of revenue

---

Exs. H-K).  Note that this Court can consider matters of public record notwithstanding their absence from the Complaint.  (*See* Br. at 22 n.19.)

[25]  Because the total fees were disclosed, Plaintiffs obviously cannot argue the fees were higher than they believed.  Rather, Plaintiffs claim that they "would not have purchased the American Funds . . . had they known of the improper practices."  (CAC ¶ 114).  This merely alleges transaction causation—not loss causation.

17

sharing that were not included in the total fee disclosed in the Prospectus.  To the extent *Siemers* holds to the contrary, it should be rejected in favor of the clear weight of authority.

In re Mutual Funds Inv. Litig., 384 F. Supp. 2d 845 (D. Md. 2005), another case on which Plaintiffs rely, is also distinguishable.  That case involved market timing and late trading, not revenue sharing.[26]  *Id.* at 852.  Moreover, plaintiffs in that case were able to allege a direct link between the challenged practices and their loss.[27]  Here, Plaintiffs do not—and cannot—make any similar allegations.  Where the total fees are disclosed, Plaintiffs simply cannot allege any connection between those fees and any diminished value of the Funds' shares.  *See In re Salomon Smith Barney*, 441 F. Supp. 2d. at 589 (rejecting an argument that plaintiffs were "damaged by being 'forced to pay excessive and improper commissions in connection with their purchases and ownership of shares'").

### B.    PLAINTIFFS' 1933 ACT CLAIMS SHOULD BE DISMISSED

For the same reasons stated above, Plaintiffs' claims under the Securities Act of 1933 ("1933 Act") should be dismissed because:  (1) there was no duty to disclose; (2) the claimed omissions were not material; and (3) the challenged practices were fully and accurately disclosed.  Plaintiffs do not challenge that dismissal of the Securities Exchange Act of 1934 ("1934 Act") claims on these grounds also requires dismissal of the 1933 Act claims.  Nor do Plaintiffs contest that they were required to

---

[26] Importantly, in *Dura Pharms., Inc. v. Broudo,* the Supreme Court overturned Ninth Circuit precedent that allowed a plaintiff to plead loss causation with allegations that the plaintiff purchased shares at an artificially inflated price.  544 U.S. 336, 345 (2005).  But Plaintiffs do exactly what *Dura* prohibited:  they allege that they "were deceived into buying shares of American funds *at an artificially inflated value*." (CAC ¶ 115).

[27] *See id.* at 852 n.1 (noting that market timing and late trading affect the value of fund shares by forcing mutual fund investors to incur a disproportionate share of the losses on days that the NAV declines).

Gibson, Dunn &
Crutcher LLP

plead their 1933 Act claims with particularity because those claims sound in fraud. *See In re Daou Sys. Inc.*, 411 F.3d 1006, 1027 (9th Cir. 2005).[28]

### C.   PLAINTIFFS' CLAIMS ARE BARRED BY THE APPLICABLE STATUTES OF LIMITATIONS

Plaintiffs' opposition only confirms that this action was brought after the expiration of the applicable statutes of limitations.  Among other things, Plaintiffs concede that they commenced this action more than two years after a complaint based on the same conduct was filed by other shareholders.  Plaintiffs also do not contest that they, in the exercise of reasonable diligence, could have discovered the facts underlying their claims years before they filed this action.  Instead, Plaintiffs focus on the fiction that:  (1) the filing of the *Corbi v. The Capital Group Cos.*, No. CV 04-5593 (RNBx) (C.D. Cal. Jul. 15, 2004) action ("*Corbi*"), standing alone, was insufficient to trigger inquiry notice; and (2) even if Plaintiffs were on inquiry notice no later than the date of the filing of the *Corbi* action, the limitations periods were tolled pursuant to *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974). (Opp. at 19-22.)  For the reasons discussed below, Plaintiffs' arguments fail.

#### 1.   The Filing of *Corbi* Demonstrates Inquiry Notice

Plaintiffs argue that the filing of the *Corbi* action, in and of itself, was insufficient to *trigger* the running of the statute of limitations.  (Opp. at 20.) Plaintiffs' argument misses the point:  the filing of the *Corbi* action irrefutably establishes the point in time when an investor, in the exercise of reasonable diligence, could have discovered sufficient facts evidencing the possibility of improper conduct. (Br. at 19-22.)  Obviously a reasonable investor could have discovered the basis for these claims by that time because two <u>actual</u> investors filed suit.  Thus, we know inquiry notice arose at some point prior to the filing of that lawsuit in July 2004.

---

[28]   *See also In re Leadis Tech., Inc. Sec. Litig.*, No. C-05-00882 CRB, 2006 WL 496039, at *3-4 (N.D. Cal. Mar. 1, 2006); *In re Levi Strauss & Co. Sec. Litig.*, No. C-03-05605 RMW, 2007 WL 2694245, at *12 (N.D. Cal. Sept. 11, 2007).

Gibson, Dunn & Crutcher LLP

Importantly, Plaintiffs do not dispute that:  (1) Plaintiffs' claims are based on the same underlying conduct that is at issue in *Corbi*; (2) there was a plethora of information relating to Defendants' so-called revenue sharing arrangements in the public domain more than two years before the filing of this Complaint; and (3) other reasonable investors—Messrs. Corbi and Jelinek—were able to commence an inquiry into the aspects of the revenue sharing arrangements which prompted them to file suit well over two years before this action was filed.[29]

### 2.    The Limitations Period Was Not Tolled Under *American Pipe*

Plaintiffs argue that even if they were on inquiry notice more than two years before this lawsuit was initiated, the applicable limitation periods were tolled during the time the *Corbi* action was pending pursuant to *American Pipe*.[30]  (Opp. at 20-21.) Plaintiffs are incorrect for two reasons.

First, as has been repeatedly recognized, the tolling provisions of *American Pipe* are generally applicable *only* to later filings that assert exactly the same legal claims that were at issue in the earlier class action.  *See, e.g.*, *Card v. Duker*, 122 F.

---

[29]  Contrary to Plaintiffs' assertion, a judicial determination of "inquiry notice" is not premature on a motion to dismiss. *In re Infonet Servs. Corp. Sec. Litig.*, 310 F. Supp. 2d 1106, 1120-21 (C.D. Cal. 2003); *Benak v. Alliance Capital Mgmt., L.P.*, 349 F. Supp. 2d 882 (D.N.J. 2004), *aff'd* 435 F.3d 396 (3d Cir. 2006).  Indeed, the cases cited by Plaintiffs in support of this assertion (Opp. at 20), are inapposite because here there exists actual "reasonable" investors of whom the Court may take judicial notice— Nicolas Corbi and Rodney Jelinek. *See* Complaint in *Corbi v. The Capital Group Cos.*, No. CV 04-5593 (RNBx) (C.D. Cal. Jul. 15, 2004), at ¶¶ 52-56 (citing publicly available information).

[30]  In *American Pipe*, the Supreme Court addressed the issue of whether purported class members who had made a timely motion to intervene could pursue their claims after class certification was denied.  414 U.S. at 554.  The Court held that the filing of a class action serves to suspend the applicable statute of limitations as to all asserted members of the class who would have been parties had the suit been permitted to continue as a class action. *Id.*

Gibson, Dunn & Crutcher LLP

App'x 347, 349 (9th Cir. 2005).  Here, the <u>legal</u> causes of action asserted in the

present case are completely different from those asserted in *Corbi*.

The Ninth Circuit's decision in *Card v. Duker* is directly on point.  There, the

court held that a plaintiff could not benefit from the tolling provisions of *American*

*Pipe* where his later-filed individual action asserted markedly different causes of

action.  *Id.* at 349.  In refusing to toll the applicable limitations period, the court relied

on the Supreme Court's decision in *Johnson v. Railway Express*, 421 U.S. 454 (1975),

which held that the tolling effect in *American Pipe* "depended heavily on the fact that

those filings involved *exactly the same causes of action subsequently asserted*….

Only when there is <u>complete identity</u> of the causes of action will the [tolling]

protections suggested by petitioner necessarily exist." *Id.* at 467 (emphasis added).

Here, there is not only a lack of complete identity, but there is no overlap at all

between the causes of action Plaintiffs assert here and those asserted in *Corbi*.  The

*Corbi* action involved claims brought pursuant to the Investment Company Act of

1940, the Investment Advisers Act of 1940, and state law.  *See* Complaint in *Corbi* at

¶¶ 65, 76, 86, 97.  Plaintiffs here, however, assert claims only under the Securities Act

of 1933 and the Securities Exchange Act of 1934.  As these are obviously distinct

statutory schemes, Plaintiffs' claims are not subject to tolling.

The second reason Plaintiffs cannot rely on *American Pipe* is because the

tolling provisions in that case only apply to the subsequent filings of <u>individual</u>

claims, not to later filed class actions.  Courts within the Ninth Circuit—most notably

this Court—have expressly refused to extend *American Pipe* to subsequently filed

class claims in most circumstances, noting that to do otherwise would invite abuse.

*See Sheppard v. Capital One Bank*, No. CV 06-7535 GAF (FFMx), 2007 U.S. Dist.

LEXIS 70061, at *12 (C.D. Cal. July 11, 2007) (citing cases); *see also Robbin v.*

*Fluor Corp.*, 835 F.2d 213, 214 (9th Cir. 1987) (holding that a plaintiff's class action

filed after class certification was denied in an earlier case did not benefit from tolling

21

Gibson, Dunn &
Crutcher LLP

because to do so "tests the outer limits of the *American Pipe* doctrine and . . . falls beyond its carefully crafted parameters into the range of abusive options") (internal citations omitted).  Allowing Plaintiffs to avail themselves of the doctrine's narrow tolling provisions would circumvent the clear and unequivocal limits of *American Pipe* and its progeny, and would ignore the Supreme Court's intent to permit tolling only as to individual suits.  *See Crown, Cork & Seal Co. v. Parker*, 462 U.S. 345, 354 (1983).

In an effort to evade the clear inapplicability of *American Pipe*'s limited tolling provisions to the current action, Plaintiffs rely on *Catholic Soc. Servs., Inc. v. INS*, 232 F.3d 1139, 1147-49 (9th Cir. 2000).  However, as this Court has previously recognized, *Catholic Social Services* is an exception to the general rule that class claims are not tolled, and should be applied on a limited basis.  *See Sheppard*, 2007 U.S. Dist LEXIS 70061, at *8.  In *Catholic Social Services*, the Ninth Circuit found that *American Pipe* may apply to a subsequent class action if plaintiffs are not attempting to relitigate either an earlier denial of class certification or to correct a procedural deficiency.  *Catholic Soc. Servs., Inc.*, 232 F.3d at 1149.  Here, the class claims asserted in the earlier-filed *Corbi* action were judicially determined to be inappropriate for class treatment.  *See In re Am. Funds Fee Litig.*, No. CV 04-5593-GAF (RNBx), 2005 U.S. Dist. LEXIS 41884, at *11-14 (C.D. Cal. Dec. 16, 2005) (holding that claims under Sections 34(b) and 36(a) of the Investment Company Act afforded no private right of action and that claims under 36(b) were improperly brought as class claims rather than derivative claims).  Plaintiffs' newly-asserted claims therefore represent an attempt to correct procedural problems identified with the prior class action, and thus *American Pipe* does not apply.[31]  Accordingly, the Complaint is time barred and should be dismissed *in toto*.[32]

---

[31]  Indeed, as recognized by this Court, *American Pipe* should not be interpreted so broadly as to invite abuse or in a manner that is adverse to the interests of judicial economy.  *See Sheppard*, 2007 U.S. Dist. LEXIS 70061, at *11-12.  Allowing

Gibson, Dunn & Crutcher LLP

### D.  PLAINTIFFS LACK STANDING AS TO THE FUNDS THAT THEY DO NOT OWN

Plaintiffs argue that they have standing to assert claims on behalf of mutual funds that they do not own because those cases that have held to the contrary were derivative actions, not class actions.  (Opp. at 22.)  Once again, Plaintiffs are simply wrong.

Courts, including this Court, have routinely dismissed claims in class actions where plaintiffs did not purchase the mutual funds named in the complaint.  *See In re Am. Mut. Funds Fee Litig.*, 2005 U.S. Dist. LEXIS 41884, at *9-10 (holding in a class action that, "even if Plaintiffs could pursue some of their claims as direct claims, Plaintiffs have suffered no injury in fact through the ten funds in which they do not own shares. . . .  Traditional standing analysis dictates that these ten nominal defendants should be dismissed because plaintiffs cannot recover from defendants who caused them no injury in fact") (citation omitted).  Accordingly, holding that plaintiffs do not possess standing to pursue class claims on behalf of mutual funds that they do not own is in accordance with both this Court's previous opinion as well as with authority from other jurisdictions that have ruled on this issue.[33]

---

Plaintiffs here to file a second class action that contains virtually the same factual allegations as the original *Corbi* action invites the very type of abuse previously recognized by this Court as allowing putative class members *carte blanche* to "piggyback" one class action onto another and thus toll the limitations period indefinitely.

[32]  Moreover, even if *American Pipe* did apply to toll the limitations periods here, Plaintiffs still waited almost an entire year after this Court dismissed the Complaint in *Corbi* before initiating this action.  This delay, coupled with the plethora of information within the public domain prior to the date the *Corbi* plaintiffs initiated their class action, renders Plaintiffs' claims based on the 1933 Act (which are subject to a one year inquiry notice period) untimely.  (Br. at 21-23.)

[33]  *In re AIG Advisor Group Secs. Litig.*, No. 06 CV 1625 (JG), 2007 U.S. Dist. LEXIS 30179, at *12 (E.D.N.Y. Apr. 25, 2007) (ruling that class action claims brought under the Securities Act and the Exchange Act should be dismissed as to the

23

Gibson, Dunn &
Crutcher LLP

Plaintiffs' reliance on two decisions on motions for class certification cannot cure their lack of Article III standing.  (Opp. at 24.)  As this Court has held, "standing cannot be acquired through the back door of a class action."  *In re Am. Mut. Funds Fee Litig.*, 2005 U.S. Dist. LEXIS 41884, at *10 (citing *Allee v. Medrano*, 416 U.S. 802, 828-29 (1974)).

### E.   PLAINTIFFS' CONTROL PERSON CLAIMS MUST BE DISMISSED

Plaintiffs' control person claims under Section 15 of the 1933 Act and Section 20(a) of the 1934 Act fail because there is no underlying violation of those Acts. Plaintiffs do not dispute this.  Instead, Plaintiffs quite remarkably both cite to ***and*** quote portions of Section 20A of the 1934 Act (which deals with insider trading).  But Plaintiffs do not bring a claim under Section 20A.  Whether this was in error or not, that section has no application in this case.

---

funds that plaintiffs did not own because they could not allege "injury from the purchase or sale of funds they never invested in"); *In re Scudder Mut. Funds Fee Litig.*, No. 04 Civ. 1921 (DAB), 2007 WL 2325862, at *9-10 (S.D.N.Y. Aug. 14, 2007); *In re Salomon Smith Barney*, 441 F. Supp. 2d at 606-07; *Forsythe v. Sun Life Fin., Inc.*, 417 F. Supp. 2d 100, 119-20 (D. Mass. 2006); *Stegall v. Ladner*, 394 F. Supp. 2d 358, 363 (D. Mass. 2005).

24

1

## III.

2

## <u>CONCLUSION</u>

3       For the foregoing reasons, Defendants' motion to dismiss the Consolidated

4   Amended Complaint should be granted.

5

6   DATED:  January 31, 2008

7                                   Respectfully submitted

8                                   GIBSON, DUNN & CRUTCHER LLP
9                                   GARETH T. EVANS
                                    ANDREW Z. EDELSTEIN

10

11                                  By: _____/s/_____
12                                                   Andrew Z. Edelstein

13                                  MILBANK, TWEED, HADLEY &
14                                    McCLOY LLP
                                    JAMES N. BENEDICT
15                                  SEAN M. MURPHY
                                    C. NEIL GRAY

16

17                                  By: _____/s/_____
18                                                   James N. Benedict

19                                  Attorneys for Defendants
                                      The Capital Group Companies, Inc.,
20                                    Capital Research and Management Company, and
                                      American Funds Distributors, Inc.

21

22

23

24

25

26

27

28