

JS-6

LINK: 48

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re AMERICAN FUNDS SECURITIES LITIGATION | Case No. CV 06-7815 GAF (RNBx)<br><br>[Related to CV 04-5593 GAF (RNBx)] |
| This document related to:<br>ALL ACTIONS | **MEMORANDUM AND ORDER REGARDING DEFENDANTS' MOTION TO DISMISS CONSOLIDATED AMENDED COMPLAINT** |

## I.

## INTRODUCTION

In this putative securities class action, Plaintiff investors allege that, during the relevant time period, the Capital Group Companies, Inc. and other entities that collectively make up the American Funds mutual fund family engaged in practices with brokerage firms that deprived investors of conflict-free advice and depleted mutual fund assets. The alleged scheme consists of two principal elements. First, Plaintiffs allege that American Funds charged its mutual funds excessive management and marketing fees that dissipated assets and thereby reduced the

1  return to investors in those funds.  But more importantly, according to Plaintiffs,
2  American Funds used at least a portion of these excessive fees to pay additional
3  compensation, which Plaintiffs characterize as "kickbacks," to brokers as an incentive
4  to the brokers to steer investors into purchasing American Funds mutual funds.  As a
5  result, according to Plaintiff investors, they received biased counsel from these
6  secretly compensated broker-dealers instead of impartial investment advice.  Two
7  different groups of investors filed suit making these claims: the Chin group which filed
8  suit in December 2006 and the Shaftan group which filed in January 2007.  The two
9  cases were consolidated and Plaintiff investors filed a Consolidated Amended
10 Complaint ("CAC") that alleges that these activities violate Section 12(a)(2) of the
11 1933 Act, Section 10(b) of the 1934 Act, and their corresponding "control person"
12 liability provisions.

        Defendants now move for dismissal of these claims on multiple grounds. Among other things, they contend that the CAC fails to state claims upon which relief can be granted, that the CAC fails to plead fraud with the requisite particularity, that Plaintiffs lack standing to bring suit, and that the claims are time-barred.  At the hearing on the motion, the Court tentatively concluded that the 1933 Act claims were time-barred but that the 1934 Act claims were timely.  Plaintiff investors offered little opposition, either in writing or at oral argument, regarding the 1933 Act claims; they have vigorously opposed the contention that the 1934 Act claims are time-barred. Nevertheless, having further reviewed the CAC, the parties' written submissions, and the evidence that bears on the inquiry notice doctrine, the Court concludes that the statute of limitations has run on all of these claims.  The evidence presented by Defendants establishes that regulatory agencies and various news outlets had focused on the very scheme that is at issue in this case at least three years before this lawsuit was filed.  For example, the <u>Los Angeles Times</u>, in November 2003, reported an SEC investigation into numerous mutual fund companies, including the

American Funds group, regarding payments of the exact type described in the CAC. The article explained that the investigation into the mutual fund companies followed on the heels of the SEC's $50 million settlement with Morgan Stanley which had received "substantial hidden fees" from these mutual fund companies. Similar information was publicly disseminated by the SEC regarding an industry-wide investigation of the very practices at issue in this case. Not long after this information was publicly disseminated, another group of investors – the Corbi Plaintiffs – filed suit in this Court complaining about such charges more than two years before the Chin and Shaftan actions were filed.

Accordingly, even though it would ordinarily be difficult to rule on the statute of limitations question on a motion to dismiss, the record in this case permits a ruling as a matter of law. As explained in greater detail below, the motion to dismiss is **GRANTED** and the case is **DISMISSED WITH PREJUDICE.**

## II.

## DISCUSSION

### A. THE LEGAL STANDARD FOR A 12(B)(6) MOTION

A Rule 12(b)(6) motion to dismiss tests the legal sufficiency of the claims asserted in the complaint and is proper only where there is either a "lack of a cognizable legal theory" or an "absence of sufficient facts alleged under a cognizable legal theory." Balistreri v. Pacifica Police Dep't, 901 F.2d 696, 699 (9th Cir. 1988). The court accepts all factual allegations pleaded in the complaint as true; it then construes those facts, and draws all reasonable inferences therefrom, "in the light most favorable to the nonmoving party." Cahill v. Liberty Mut. Ins. Co., 80 F.3d 336, 337-38 (9th Cir. 1996) (citation omitted).

Ordinarily, a Rule 12(b)(6) motion that presents evidence extrinsic to the pleadings is "treated as a motion for summary judgment and disposed of as provided in Rule 56." Fed R. Civ. P. 12(b)(6). There are, however, limited exceptions. In

1  determining a motion to dismiss, the Court may consider documents attached to the
2  complaint, as well as documents to which the complaint specifically refers and whose
3  authenticity is not questioned, even if they are not physically attached to the
4  complaint. See Hal Roach Studios, Inc. v. Richard Feiner & Co., 896 F.2d 1542,
5  1555 n.19 (9th Cir. 1989); Branch v. Tunnell, 14 F.3d 449, 454 (9th Cir. 1994) ("[W]e
6  hold that documents whose contents are alleged in a complaint and whose
7  authenticity no party questions, but which are not physically attached to the pleading,
8  may be considered in ruling on a Rule 12(b)(6) motion to dismiss. Such consideration
9  does not convert the motion to dismiss into a motion for summary judgment.")
10 (internal quotation marks and citations omitted), overruled on other grounds as
11 recognized in Galbraith v. County of Santa Clara, 307 F.3d 1119, 1126 (9th Cir.
12 2002); Inlandboatmens Union of the Pac. v. Dutra Group, 279 F.3d 1075, 1083 (9th
13 Cir. 2002).

14  In addition, the Ninth Circuit has extended this exception to cover "documents
15 crucial to the plaintiff's claims, but not explicitly incorporated in his complaint." Parrino
16 v. FHP, Inc., 146 F.3d 699, 706 (9th Cir. 1998), superseded by statute as stated in
17 Abrego Abrego v. The Dow Chem. Co., 443 F.3d 676, 681 (9th Cir. 2006). Thus, the
18 Court may consider "a document the authenticity of which is not contested, and upon
19 which the plaintiff's complaint necessarily relies." Id. Likewise, in considering the
20 motion, this Court may take judicial notice of its own orders and of records in a case
21 before it. See McDonald v. Blackburn, 806 F.2d 613, 620-21 (5th Cir. 1986) (citing
22 State of Florida v. Charley Toppino & Sons, Inc., 514 F.2d 700, 704 (5th Cir. 1975)).
23 Similarly, other matters that are properly subject to judicial notice may be considered
24 along with the complaint when deciding a motion under Rule 12(b)(6). See MGIC
25 Indem. Corp. v. Weisman, 803 F.2d 500, 504 (9th Cir. 1986).

26  In this case, the Court's consideration of the statute of limitations issues
27 involves a review of the documents essential to the claim, documents already in the
28

4

Court's files, and judicial notice of the existence of published reports regarding investigations by the SEC and others into the payment of hidden brokerage fees by mutual fund companies including Defendants in this case.

**B. THE STATUTE OF LIMITATIONS**

Section 12(a)(2) claims must be brought "within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence." 15 U.S.C. § 77m. Section 10(b) claims, in turn, must be brought within two years of "discovery of the facts constituting the violation." 28 U.S.C. § 1658(b)(1).

"[E]ither actual or inquiry notice can start the running of the statute of limitations on a federal securities fraud claim." Betz v. Trainer Wortham & Co., Inc., 519 F.3d 863, 869 (9th Cir. 2008). In the context of inquiry notice, the Ninth Circuit has adopted the "inquiry-plus-reasonable-diligence test" to determine whether the statute of limitations begins running. Id. at 870. Under this test, a court first determines when the plaintiff had inquiry notice of the facts giving rise to his securities claim. Id. at 870-71. A plaintiff is on inquiry notice when

> there exists sufficient suspicion of fraud to cause a reasonable investor to investigate the matter further. . . . [W]e caution that inquiry notice should not be construed so broadly that the particular plaintiff cannot bring his or her suit within the limitations period. The facts constituting inquiry notice must be sufficiently probative of fraud – sufficiently advanced beyond the stage of a mere suspicion to incite the victim to investigate. [Citations omitted.]

Id. at 871 (internal quotation marks and alterations omitted).

"[T]he second stage of [the] inquiry . . . . [asks] whether the plaintiff exercised reasonable diligence in investigating the facts underlying the alleged fraud." Id. While the inquiry remains "essentially objective in character," it "necessarily entails an assessment of the plaintiff's particular circumstances from the perspective of a reasonable investor." Id. Under this standard, the Circuit has stated that the

1  defendant bears a "considerable burden" in demonstrating that the plaintiff's claim is
2  time-barred. Id.

3  **C. ANALYSIS**

4  The earlier-filed of the two complaints now comprising the CAC, the <u>Chin</u>
5  complaint, was filed December 8, 2006. (<u>See</u> Docket No. 1.) Defendants argue that
6  the filing of the <u>Corbi</u> complaint on July 15, 2004 (CV 04-5593 GAF (RNBx)), as well
7  as publicly available information in the media, constituted inquiry notice sufficient to
8  trigger the running of the limitations period. (Mot. at 19-23.) Defendants also argue
9  that the very existence of the <u>Corbi</u> complaint is evidence that a reasonable investor
10 would have been on inquiry notice to investigate Defendants' purported wrongdoing
11 well over two years before the <u>Chin</u> complaint was filed because other investors – that
12 is, the <u>Corbi</u> Plaintiffs – did just that. For the reasons discussed in greater detail
13 below, the Court agrees.

14  **1. SECTION 12(A)(2) CLAIMS: ONE YEAR STATUTE OF LIMITATIONS**

15  As noted above, Count 1, for violation of Section 12(a)(2) of the 1933 Act,
16 must be brought within one year "after the discovery of the untrue statement or the
17 omission, or after such discovery should have been made by the exercise of
18 reasonable diligence." 15 U.S.C. § 77m.

19  Here, Plaintiffs' own complaint alleges that "[t]he truth [that Defendants were
20 violating various securities laws] was partially disclosed" in February 2005 when
21 NASD fined and censured American Funds "for their involvement in this insidious
22 scheme that betrayed the trust of their investors." (<u>Chin</u> Compl. ¶ 7.) This "truth,"
23 Plaintiffs argue, was further exposed in March 2005 when the California Attorney
24 General's Office "filed suit against Defendants for the kickback scheme alleged
25 herein." (<u>Id.</u>)

26  By these allegations, Plaintiffs themselves acknowledge that they were on
27 inquiry notice of Defendants' alleged wrongdoing when NASD fined and censured
28

6

1  American Funds in February 2005, well over one year before the <u>Chin</u> complaint was
2  filed on December 8, 2006. NASD's actions, in Plaintiffs' own words, "partially
3  disclosed" the "truth" of Defendants' fraudulent activities, which the Court views as a
4  deliberate understatement. NASD's attack on such charges was well-known before
5  2005; NASD's action was the final action in a case that was a matter of public record
6  long before NASD imposed its discipline. Plaintiffs, moreover, were certainly on
7  inquiry notice by March 2005, when the California Attorney General's office filed suit
8  against Defendants for the same kickback scheme alleged in the <u>Chin</u> complaint.
9  (See <u>Chin</u> Compl. ¶ 7.) While "[t]he question of whether inquiry notice exists is
10 objective and contemplates a 'reasonable investor' or 'reasonable person' standard,"
11 <u>Betz</u>, 519 F.3d at 871, it appears that objectively, and by Plaintiffs' own admission,
12 the NASD and California Attorney General actions were "sufficiently advanced
13 beyond the stage of a mere suspicion" and disclosed enough facts probative of fraud
14 to "incite [Plaintiffs] to investigate" the alleged wrongdoing. <u>Id.</u>

15       The second question, whether Plaintiffs exercised reasonable diligence in
16 investigating the facts underlying the alleged fraud, is also an objective inquiry. <u>Betz</u>,
17 519 F.3d at 871. There is no indication that Plaintiffs exercised the requisite diligence
18 to investigate the facts underlying the alleged fraud. Indeed, the majority of evidence
19 cited in the CAC to support Plaintiffs' allegations are Prospectuses dating back to the
20 year 2000. These Prospectuses were available well before the alleged fraud was
21 "partially disclosed" in February 2005 when NASD fined and censured American
22 Funds. (See CAC ¶ 51 [3/15/00 Prospectus]; ¶ 64 [3/15/01 Prospectus];
23 ¶ 71 [2/15/02 Prospectus]; ¶ 80 [3/1/03 Prospectus]; ¶ 89 [3/1/04 Prospectus].) There
24 is no good reason given, nor could one be concocted, for delaying the filing of the
25 <u>Chin</u> complaint for more than a year after NASD had publicly concluded that
26 American Funds should be disciplined for the conduct that is the focus of this lawsuit.
27       Without needing to consider the role of the <u>Corbi</u> complaint, the Court finds
28

that Plaintiffs themselves acknowledge the existence of facts that put them on inquiry notice of their Section 12(a)(2) claims by February 2005, or March 2005 at the latest, but did not file their complaint until the applicable one-year statute of limitations had run.[1] On that basis, the Court finds Plaintiffs' Section 12(a)(2) claim (Count 1) is time-barred and accordingly is **DISMISSED WITH PREJUDICE**. Count 2, for violation of Section 15 of the 1933 Act, seeks to impose control person liability and is premised on there being an underlying violation under Section 12(a)(2). Accordingly, Count 2 is also **DISMISSED WITH PREJUDICE**.

### 2. SECTION 10(B) CLAIMS: TWO YEAR STATUTE OF LIMITATIONS

Count 3, for violation of Section 10(b) of the 1934 Act, must be brought within two years of discovery of the facts constituting a violation. 28 U.S.C. § 1658(b)(1). The Court concludes that Plaintiffs' Section 10(b) claims (Counts 3 and 4) are also time-barred given that: (1) publicly available information coupled with the filing of the Corbi complaint were sufficient to impart inquiry notice to Plaintiffs; and (2) Plaintiffs failed to exercise the requisite diligence to investigate the facts underlying the alleged fraud once they were on inquiry notice.

#### a. Inquiry Notice

##### i. Publicly Available News Articles

Defendants have submitted various news articles in support of their motion of which the Court takes judicial notice. See Fed. R. Evid. 201; cf. In re Infonet Servs. Corp. Sec. Litig., 310 F. Supp. 2d 1106, 1115-16 (C.D. Cal. 2003) (Manella, J.) (court may take judicial notice of analyst reports that were submitted, in part, to establish whether certain information was provided to market).

These news articles focus on the activities of **the defendants named in this case** and **on the same payments** that are the center of their alleged wrongdoing. The earliest such report, dated November 18, 2003, disclosed that the SEC was

---

[1] At oral argument, moreover, Plaintiffs' counsel essentially conceded that the Section 12(a)(2) claims were time-barred and submitted on the Court's tentative ruling on this issue.

8

investigating whether some of the nation's largest mutual fund companies "engaged in improper sales practices." (Edelstein Decl., Ex. B ["Fund Scandal Spreads to Sales," Los Angeles Times, Nov. 18, 2003].) According to the article, "The Southland firms being looked at by the SEC are Pimco Funds, the Newport Beach-based bond-fund giant, **and Capital Research & Management Co., of Los Angeles, which runs the American Funds group**." (Id. (emphasis added).) In plain English, the Los Angeles Times article explained that "[t]he companies paid undisclosed fees – sometimes in cash, but often in the form of commission-generating brokerage business – for placement on a list of preferred funds that Morgan Stanley brokers recommended to investors, according to administrative actions filed Monday by the SEC and the NASD, . . . a self-regulatory group overseeing the brokerage industry." (Id.) In short, the article disclosed the very scheme that is at the heart of the securities violations alleged in the CAC. A review of the entire article establishes more than "sufficient suspicion of fraud to cause a reasonable investor to investigate the matter further . . .," Betz, 519 F. 3d, at 871, because it reports that one of the brokerages receiving such payments, Morgan Stanley, "agreed to pay $50 million to settle SEC charges that it had received substantial hidden fees from . . . 14 companies in return for promoting their funds to investors over those offered by dozens of competitors." (Edelstein Decl. Ex. B.) That Morgan Stanley agreed to such a large settlement figure is more than a little evidence that the practice under scrutiny had occurred and was of questionable legitimacy.

The Los Angeles Times article was not the only public disclosure of concerns over the problem of mutual fund companies paying brokers to push their products. Other news articles revealed similar allegations and investigations:

- "State to Probe Three Mutual Fund Firms; At Issue is Whether the Companies Defrauded Investors by Failing to Inform Them About Deals Made with Brokers. A New Law Gives the California Attorney General Authority to Investigate," San Jose Mercury News, Jan. 3, 2004. (Edelstein Decl., Ex. C).

This article again named Capital Research as being "among those [companies] that had special agreements to pay extra compensation to Morgan Stanley in exchange for preferred marketing of their funds." In the article, a Capital Research spokesperson confirmed that the company had received a subpoena from the California Attorney General's office, and then-Attorney General Bill Lockyer was quoted as saying, "We're going to aggressively participate in these investigations and possible prosecutions on behalf of California investors."

• "Conflicting Interests: Why a Brokerage Giant Pushes Some Mediocre Mutual Funds – Jones & Co. Gets Payments From 'Preferred' Vendors," The Wall Street Journal, Jan. 9, 2004. (Edelstein Decl., Ex. D). In this article, which focuses principally on the activities of brokerage firm Edward D. Jones & Co., the author explains in detail how the practice at issue in this case works, and why it disadvantages investors. Among other things, it reports that "[f]und-company payments to encourage broker favoritism began in the mid-1980s" and that "[t]he nation's 50 largest mutual-fund groups quietly dole out $1.5 billion annually in revenue-sharing payments to brokers . . . ." Id. The article confirmed that American Funds, "the nation's third-largest fund company," makes payments to Jones; a spokesman for American Funds confirmed that Jones "is the top seller of its funds." Id.

• "Funds Manager [Capital Research] is Said to Face S.E.C. Inquiry," The New York Times, June 29, 2004. (Edelstein Decl., Ex. E). The lead in this article states, "Capital Research and Management, the company that manages the $450 billion mutual fund group known as the American Funds, has notified some people who sell its services that it is under investigation by the Securities and Exchange Commission" and that "[r]egulators are examining whether Capital Research rewarded the brokerage firms that aggressively sold its funds by funneling commissions on securities trades chiefly to those firms."

> The article further explained that, "[s]uch a practice, known as directed brokerage, is a type of pay-to-play arrangement that can represent a conflict of interest, critics say." The article noted that "[a]ccording to people briefed on the matter, the S.E.C. has looked back at the commissions that Capital Research paid to conduct its trades and found a strong correlation between the recipients and the brokerage firms selling the largest amounts of Capital Research funds." The article concluded by quoting an individual who investigates "money management abuses," who asserted that "[i]t is a national tragedy that investors' retirement savings are being used to benefit the money managers they hire."

In short, the allegedly unlawful practices described in the CAC were the subject of lengthy news articles in prominent national publications as much as three years before the CAC was filed in this Court. Those articles set forth sufficiently detailed descriptions of the allegedly unlawful practices and the companies that were involved, including the named defendants in this case, that they put Plaintiffs on inquiry notice sufficient to start the running of the statute of limitations.

### ii. SEC Proceedings and Orders

Not only was the press carrying stories regarding the practices in dispute in this case, but those practices were also the subject of SEC administrative proceedings. Siemers v. Wells Fargo & Co., No. C 05-04518 WHA, 2006 WL 2355411, at *1-2 (N.D. Cal. Aug. 14, 2006) lists a number of enforcement orders in several proceedings addressing issues similar to those in dispute here, including orders against Morgan Stanley (Nov. 17, 2003); Massachusetts Financial Services Company (Mar. 31, 2004); Franklin Advisers, Inc. & Franklin/Templeton Distributors, Inc., (Dec. 13, 2004); Edward D. Jones (Dec. 22, 2004); and Putnam Inv. Management, LLC (Mar. 23, 2005). These orders, which resulted from SEC investigations into the activities of these firms, reveals an ongoing inquiry by the SEC

into "revenue sharing" with brokerage firms commencing more than two years before the filing of the <u>Chin</u> complaint.

These actions were a matter of public record, which the SEC sometimes memorialized in press releases. For example, when the Morgan Stanley settlement was concluded, the SEC issued a press release on November 17, 2003, in which it fully described the investigation and included the following statement:

> Stemming from the SEC's ongoing industry-wide investigation of mutual fund sales practices, this inquiry uncovered two distinct, firm-wide disclosure failures by Morgan Stanley. The first relates to Morgan Stanley's "Partners Program" and its predecessor, in which a select group of mutual fund complexes paid Morgan Stanley substantial fees for preferred marketing of their funds. To incentivize its sales force to recommend the purchase of shares in these "preferred" funds, Morgan Stanley paid increased compensation to individual registered representatives and branch managers on sales of those funds' shares. The fund complexes paid these fees in cash or in the form of portfolio brokerage commissions.

The release went on to note:

> The Commission's Order finds that this conduct violated Section 17(a)(2) of the Securities Act of 1933 and Rule 10b-10 under the Securities Exchange Act of 1934. Section 17(a)(2) prohibits the making of materially misleading statements or omissions in the offer and sale of securities. Rule 10b-10 requires broker dealers to disclose the source and amount of any remuneration received from third parties in connection with a securities transaction. The Order also finds that the conduct violated NASD Rule 2830(k), which prohibits NASD members from favoring the sale of mutual fund shares based on the receipt of brokerage commissions.

> Stephen M. Cutler, Director of the Commission's Division of Enforcement, said: "Unbeknownst to Morgan Stanley's customers, Morgan Stanley received monetary incentives -- in the form of "shelf space" payments -- to sell particular mutual funds to its customers. When customers purchase mutual funds, they should understand the nature and extent of any conflicts of interest that may affect the transaction."

(<u>See</u> "SEC Charges Morgan Stanley With Inadequate Disclosure in Mutual Fund Sales; Morgan Stanley Pays $50 Million To Settle SEC Action," <u>available at</u> www.sec.gov/news/press/2003-159.htm)

A similar release was issued in March 2004 upon the settlement of a case against Massachusetts Financial Services Company arising from the same kind of conduct alleged in this case. That release noted that "[t]he Commission's charges stem from an ***ongoing industry-wide investigation of mutual fund sales practices***

1  ***begun by the SEC in the Spring of 2003.*** That investigation previously led to a $50
2  million settlement with Morgan Stanley DW Inc. in November for that firm's failure to
3  adequately disclose to its customers its receipt of such shelf-space payments from
4  mutual funds." (See "Mutual Fund Manager MFS Pays $50 Million Fine To Settle
5  SEC Enforcement Action; Firm Failed To Adequately Disclose Use of Mutual Fund
6  Brokerage Commissions To Pay for 'Shelf Space' at Brokerage Firms," available at
7  www.sec.gov/news/press/2004-44.htm (emphasis added).)  The release went on to
8  state:

> "A mutual fund manager's use of fund brokerage commissions to pay for the marketing and distribution of the fund creates a conflict of interest that must be fully and fairly disclosed," said Stephen M. Cutler, Director of the Commission's Division of Enforcement. "The Commission continues to investigate whether the managers of other mutual funds and the brokerage firms that sold those funds have similarly failed to disclose such conflicts."

Id. From the discussion above, it had been publicly disclosed several months earlier that American Funds was among the mutual fund groups that had been targeted by the SEC's industry-wide investigation.  Perhaps that is one reason why, more than two years before the Chin complaint was filed, investors in American Funds mutual funds brought a securities lawsuit based on the practice of making improper undisclosed payments to various broker-dealers.

### iii. The Corbi Complaint

The Corbi complaint was filed on July 15, 2004, over two years before the Chin complaint was filed on December 8, 2006.  While the Corbi and Chin complaints allege different legal causes of action, the two complaints allege a nearly identical scheme of wrongdoing against Defendants.  For example, the Corbi complaint alleges:

> The Prospectuses failed to disclose and misrepresented, inter alia, the following material and damaging adverse facts which damaged plaintiffs and other members of the Class:
>
> (a) that the Investment Adviser Defendant authorized the payment from fund assets of excessive commissions to broker dealers in exchange for preferential marketing services and that such payments were in breach of

their fiduciary duties, in violation of Section 12b of the Investment Company Act, and unprotected by any "safe harbor[.]"

(Corbi Compl. ¶ 60(a).) The Chin complaint nearly mirrors these allegations:

[T]he Prospectuses were materially false and misleading as they omitted the following material facts:

(a) that the Investment Adviser and Distributor Defendants authorized the payment from fund investor assets of excessive commissions to broker dealers in exchange for preferential marketing services and that such payments were in breach of their fiduciary duties, in violation of Section 12(b) of the Investment Company Act, and unprotected by any "safe harbor[.]"

(Chin Compl. ¶ 33(a).)

The Corbi complaint further alleged that the Prospectuses failed to disclose:

(b) that the Investment Adviser Defendant directed brokerage payments to firms that favored American Funds, which was a form of marketing that was not disclosed in or authorized by the American Funds Rule 12b-1 Plan[.]

(Corbi Compl. ¶ 60(b).) The Chin complaint similarly alleged that the Prospectuses failed to disclose:

(b) that the Investment Adviser and Distributor Defendant directed brokerage payments to brokerage firms that favored the American Funds, which was a form of marketing that was not disclosed in or authorized by the American Funds' Rule 12b-1 plans[.]

(Chin Compl. ¶ 33(b).)

Likewise, the Corbi complaint alleged that the Prospectuses did not disclose:

(c) that the American Funds Rule 12b-1 Plan was not in compliance with Rule 12b-1, and that payments made pursuant to the plan were in violation of Section 12 of the Investment Company Act because, among other reasons, the plan was not properly evaluated by the Director Defendants and there was not a reasonable likelihood that the plan would benefit the company and its shareholders[.]

(Corbi Compl. ¶ 60(c).) The Chin complaint mirrored these allegations by claiming that the Prospectuses did not disclose:

(c) that the American Funds' Rule 12b-1 plans were not in compliance with Rule 12b-1, and that payments made pursuant to the plans were in violation of Section 12 of the Investment Company Act because, among

14

> other reasons, the plans were not properly evaluated by the American Funds' Directors and there was not a reasonable likelihood that the plans would benefit the company and its shareholders.

(Chin Compl. ¶ 33(c).)

As excerpted above, the allegations in the Chin complaint are almost a verbatim copy of the allegations found in the Corbi complaint. The very existence of the Corbi complaint – which clearly demonstrates that sufficient information existed to provide a basis for asserting claims that are factually indistinguishable from those presented in the later-filed lawsuits – is nearly dispositive evidence that there was sufficient information in the public sphere to impart inquiry notice on reasonable investors of the existence of a claim against American Funds for securities law violations. See Benak v. Alliance Capital Mgmt. LP, 349 F. Supp. 2d 882, 892 (D.N.J. 2004) (dismissing plaintiff investors' securities action as time-barred upon finding, in part, that very existence of earlier-filed complaint reinforced conclusion that there were sufficient storm warnings to trigger the limitations period for plaintiffs); Infonet, 310 F. Supp. 2d at 1118 (dismissing plaintiff investors' claims as time-barred upon finding that drastic decrease in company's stock within one year, coupled with nearly universal negative analyst reports, were sufficient to impart inquiry notice and trigger limitations period); DeBenedictis v. Merrill Lynch & Co., Inc., 492 F.3d 209, 218 (3d Cir. 2007) (Alarcon, J.) (affirming dismissal of action as time-barred because publicly available information, including news articles and NASD press releases, were sufficient storm warnings to trigger inquiry notice).

Certainly, when taken together with all of the other information in the public domain regarding investigations into "directed brokerage," "shelf space" purchases, and "revenue sharing" between mutual fund companies, including the American Funds group, and broker-dealers, the filing of the Corbi complaint would have put anyone giving reasonable attention to the subject on notice of the existence of a claim under the 1933 and 1934 Acts.

1    Accordingly, the Court concludes that by the time the <u>Corbi</u> complaint was
2    filed in July 2004, there were "facts constituting inquiry notice" that were "sufficiently
3    probative of fraud – sufficiently advanced beyond the stage of a mere suspicion . . . to
4    incite the victim to investigate." <u>Betz</u>, 519 F.3d at 871.

### b. Reasonable Diligence

Having found that Plaintiffs were on inquiry notice of the alleged wrongdoing, the Court now turns to the reasonable diligence prong. <u>Betz</u>, 519 F.3d at 871. In the words of the Ninth Circuit, the "statute of limitations period begins to run once the investor, in the exercise of reasonable diligence, should have discovered the facts underlying the alleged fraud." <u>Id.</u> at 870 (quoting <u>Sterlin v. Biomune Sys.</u>, 154 F.3d 1191, 1201 (10th Cir. 1998)). Plaintiffs gloss over this aspect of the test and argue that what a reasonable investor should have known is "particularly suited to a jury determination," <u>Livid Holdings Ltd. v. Salomon Smith Barney, Inc.</u>, 416 F.3d 940, 951 (9th Cir. 2005), and that the issue of diligence "is the issue that is difficult to resolve as a matter of law." <u>In re Micon Techs., Inc. Sec. Litig.</u>, Civ. No. CV-06-085-S-BLW 2007, U.S. Dist. LEXIS 12446 (D. Ida. Feb. 21, 2007). The Court does not disagree with those abstract propositions, but the question is whether their application in this case on this record defeats the motion to dismiss. Plaintiffs provide little analysis as to why they should, and the Court concludes that, on this record, they do not.

The inquiry notice and reasonable diligence tests tend to merge in this case because of the extraordinary detail of what was publicly disclosed by at least November 2003. As noted above, the SEC press release of November 17, 2003, referenced an "ongoing industry-wide investigation of mutual fund sales practices" which included its receipt of payments from a "select group of mutual funds . . . for preferred marketing of their funds." (<u>See</u> www.secgov/news/press/2003-159.htm.) That release plainly stated that the SEC had issued an order in which it found that such payments violated provisions of the 1933 and 1934 Acts and that Morgan Stanley, which was the specific target of that investigation, was censured and agreed

to a payment of $50 million to settle the action. (Id.) And, as also noted above, other press coverage of the SEC's action disclosed that the American Funds group was one of the companies that had made payments of undisclosed fees to Morgan Stanley and other brokers. (See Sec. C.2.a.i., supra.) Spokespersons for American Funds acknowledged that it had been targeted by the SEC, which had asked the organization for information regarding its sales practices. In short, the public record by late 2003 contained information that not only put investors on notice of a possible fraud, but delineated the facts constituting how the scheme worked and reported that the SEC had, in November 2003, already taken action against one brokerage firm as punishment for engaging in the practice.

In short, although the issue of diligence may not ordinarily be resolved as a matter of law on a motion to dismiss, the unusual record in this case allows for a determination of the question at this early stage of the proceedings. The Court concludes that by November 2003, or shortly thereafter, investors were on notice of the alleged fraud scheme described in this case and would, in the exercise of reasonable diligence, have been aware of that scheme. Indeed, other similarly-situated investors – that is, the Corbi Plaintiffs – were able to investigate and bring a substantively similar complaint by mid-2004, well over two years earlier. This plainly demonstrates what an investor exercising reasonable diligence in fact accomplished. Moreover, even if the Court were to conclude that the statute of limitations did not commence running until the filing of the Corbi complaint, the motion to dismiss would still be well-taken because this lawsuit was brought more than two years after Corbi was filed.

Though the Court agrees that Defendants bear a "considerable burden" in demonstrating that Plaintiffs' claims are time-barred, Betz, 519 F.3d at 871, the Court concludes that Defendants have, for the reasons discussed above, met that burden.

//

//

### c. Plaintiffs' Tolling Argument is Without Merit

Plaintiffs argue, in the alternative, that if they were on inquiry notice because of the Corbi action, the statute of limitations was tolled during the period that the Corbi case was litigated as a class action. (Opp. at 20-22.) Case law establishes limited circumstances in which the filing of an earlier class action will toll the statute of limitations. Crown, Cork & Seal Co., Inc. v. Parker, 462 U.S. 345 (1983); Am. Pipe & Const. Co. v. Utah, 414 U.S. 538 (1974); Catholic Soc. Servs., Inc. v. I.N.S., 232 F. 3d 1139 (9th Cir. 2000). In American Pipe, a putative class action was filed in district court, but was ultimately not certified because the district court found that the Rule 23 requirement of numerosity had not been met. The Supreme Court held that the statute of limitations was tolled as to litigants who had sought to intervene to pursue claims that were encompassed by the class action. See generally 414 U.S. at 550, et seq. In Crown, Cork & Seal, the Court extended the tolling ruling to the individual claims of any person who was a member of the purported class, not just to those who had sought to intervene. 462 U.S. at 350, et seq. In both cases, the claims that the individual plaintiffs sought to bring were the same claims as those asserted in the class action lawsuit. Neither of these cases are particularly helpful to Plaintiffs because this case involves different claims than those presented in the Corbi case and because Plaintiffs are attempting not to bring individual claims but rather to proceed as a class action. As this Court has previously noted, "[a]lthough the Supreme Court has not considered whether the tolling rule applies to subsequent class claims [as opposed to individual claims], those circuits that have expressly addressed the issue have refused to extend the tolling doctrine to class claims in most circumstances." Sheppard v. Capital One Bank, 06-7535 GAF (FFMx), 2007 U.S. Dist. LEXIS 70061, at *7 (C.D. Cal. July 12, 2007) (collecting cases).

Catholic Social Services, 232 F.3d at 1149, likewise provides no support for an argument that the statute of limitations on class claims should be tolled in this case. Catholic Social Services involved a complex, 15-year series of class action

| | |
|---|---|
| 1 | lawsuits initially involving efforts by an immigrant rights group to challenge aspects of |
| 2 | INS policies as inconsistent with the Immigration Reform and Control Act ("IRCA"), |
| 3 | and later involving a constitutional challenge to Section 377 of the Illegal Immigration |
| 4 | Reform and Immigrant Responsibility Act of 1996. In the first lawsuit, the proposed |
| 5 | class was certified by the district court and that court found for plaintiffs and issued a |
| 6 | remedial order. The Ninth Circuit affirmed, but the Supreme Court ultimately reversed |
| 7 | on the ground that "the record did not establish that plaintiffs' suit was ripe." 232 F.3d |
| 8 | at 1142. Several years later, after multiple intervening proceedings, the Ninth Circuit |
| 9 | was called on to determine whether the filing of the initial class action lawsuit tolled |
| 10 | the running of the statute of limitations. Recognizing that <u>American Pipe</u> and <u>Crown,</u> |
| 11 | <u>Cork & Seal</u> speak to the issue presented, the Circuit held that the case before it |
| 12 | involved a class that **had been properly certified in the first instance** and therefore |
| 13 | did not involve any effort to circumvent a prior ruling of the court or to piggyback one |
| 14 | class action on another. <u>See</u> 232 F.3d at 1147-50. Accordingly, the Circuit held that, |
| 15 | under those circumstances, the statute of limitations was tolled. However, since no |
| 16 | class has ever been certified by this Court, and, again, since this case purports to |
| 17 | bring claims not within the scope of the specific causes of action alleged by the <u>Corbi</u> |
| 18 | Plaintiffs, the tolling doctrine does not apply. |
| 19 | // |
| 20 | // |
| 21 | // |
| 22 | // |
| 23 | // |
| 24 | // |
| 25 | // |
| 26 | // |
| 27 | // |
| 28 | // |

III.

CONCLUSION

For the foregoing reasons, the Court **GRANTS** Defendants' motion in its entirety and **DISMISSES** the action **WITH PREJUDICE**. Because the Court concludes that all four causes of action are time-barred, the Court need not address Defendants' various alternate arguments as to why the action should be dismissed.

IT IS SO ORDERED.

DATED: June 5, 2008

Judge Gary Allen Feess
United States District Court