GIBSON, DUNN & CRUTCHER LLP
GARETH T. EVANS, SBN 138992
GEvans@Gibsondunn.com
ANDREW J. DEMKO, SBN 247320
ADemko@Gibsondunn.com
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone: (213) 229-7000
Facsimile: (213) 229-7520

MILBANK, TWEED, HADLEY & McCLOY LLP
JAMES N. BENEDICT, *Pro Hac Vice*
JBenedict@Milbank.com
SEAN M. MURPHY, *Pro Hac Vice*
SMurphy@Milbank.com
C. NEIL GRAY, *Pro Hac Vice*
CNGray@Milbank.com
One Chase Manhattan Plaza
New York, NY 10005-1413
Telephone: (212) 530-5000
Facsimile: (212) 530-5219

Attorneys for Defendants
THE CAPITAL GROUP COMPANIES, INC.,
CAPITAL RESEARCH AND MANAGEMENT
COMPANY, and AMERICAN FUNDS
DISTRIBUTORS, INC.

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| In re AMERICAN FUNDS SECURITIES LITIGATION<br><br>This document relates to:<br><br>ALL ACTIONS | MASTER FILE NO.<br><br>CV 06-7815 GAF (RNBx)<br><br>**DEFENDANTS' OPPOSITION TO PLAINTIFFS' RESPONSE TO NOVEMBER 9, 2010 ORDER REGARDING UNITED STATES SUPREME COURT DECISION OF *MERCK & CO., INC. v. REYNOLDS***<br><br>Judge:   Hon. Gary A. Feess |

# **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ...........................................................................................ii

I. PRELIMINARY STATEMENT ..............................................................................1

II. ARGUMENT ...........................................................................................................2

    A.    THIS COURT CORRECTLY APPLIED *MERCK*'S REASONABLY DILIGENT PLAINTIFF STANDARD .....................2

        1.    Plaintiffs Blatantly Misconstrue This Court's Analysis, Which Was Fully Consistent With *Merck*......................................2

        2.    *Merck* Mandates That The Statute of Limitations Begins To Run When A Reasonably Diligent Plaintiff Would Have Discovered The Fraud......................................................................3

    B.    A REASONABLY DILIGENT INVESTOR WOULD HAVE DISCOVERED THE FACTS CONSTITUTING THE VIOLATION ALLEGED HERE BY JULY 2004 AT THE LATEST ...........................................................................................5

        1.    Plaintiffs Ignore That *Corbi* Demonstrates Precisely What a Reasonably Diligent Plaintiff Could Discover...............................5

        2.    Plaintiffs Had Constructive Notice of Scienter .............................7

        3.    Plaintiffs Had Constructive Notice of Materiality .......................13

III. CONCLUSION.......................................................................................................14

Gibson, Dunn & Crutcher LLP

# **TABLE OF AUTHORITIES**

**Page(s)**

## **Cases**

*Benak v. Alliance Capital Mgmt. L.P.,*
  435 F.3d 396 (3d Cir. 2006) ...............................................................3, 4

*Betz v. Trainer Wortham & Co.,*
  519 F.3d 863 (9th Cir. 2008) ....................................................................2

*Corbi v. Capital Group Cos.,*
  No. CV 04-5593,
  2009 U.S. Dist. LEXIS 120597 (C.D. Cal. Dec. 28, 2009) ......................6

*Dale v. Martek Biosciences Corp.,*
  No. CCB-09-3124,
  2010 U.S. Dist. LEXIS 77265 (D. Md. July 30, 2010) ........................7, 11

*In re Am. Funds Sec. Litig.,*
  556 F. Supp. 2d 1100 (C.D. Cal. 2008),
  *vacated,* 2010 U.S. App. LEXIS 19403 (9th Cir. Sept. 17, 2010) ...........passim

*In re Bare Escentuals, Inc. Sec. Litig.,*
  No. C 09-3268 PJH,
  2010 U.S. Dist. LEXIS 103612 (N.D. Cal. Sept. 30, 2010) .....................11

*In re Merrill Lynch Inv. Mgmt. Funds Sec. Litig.,*
  434 F. Supp. 2d 233 (S.D.N.Y. 2006) .......................................................9

*In re Morgan Stanley & Van Kampen Mut. Fund Sec. Litig.,*
  No. 03 Civ. 8208 (RO),
  2006 WL 1008138 (S.D.N.Y. Apr. 18, 2006) ............................................9

*In re Salomon Smith Barney Mut. Fund Fees Litig.,*
  441 F. Supp. 2d 579 (S.D.N.Y. 2006) .......................................................9

*Landsberger v. Martek Biosciences Corp.,*
  No. CCB-09-3389,
  2010 U.S. Dist. LEXIS 77260 (D. Md. July 30, 2010) ........................7, 11

*Merck & Co. v. Reynolds,*
  559 U.S. __, 130 S. Ct. 1784 (2010) ..................................................passim

*Staehr v. Hartford Fin. Servs. Grp.,*
  547 F.3d 406 (2d Cir. 2008) ........................................................6, 11, 12

## **Statutes**

15 U.S.C. § 80a-33(b) .....................................................................................5

## **Rules**

17 C.F.R. § 240.10b-5(b) ................................................................................6

17 C.F.R. § 270.22c-1 .....................................................................................8

## MEMORANDUM OF POINTS AND AUTHORITIES

Pursuant to this Court's Order dated November 8, 2010, Defendants The Capital Group Companies ("Capital Group"), Capital Research and Management Company ("CRMC"), and American Funds Distributors, Inc. ("AFD") (collectively, "Defendants") respectfully submit this Opposition to Plaintiffs' Response to November 9, 2010 Order Regarding United States Supreme Court Decision of *Merck & Co., Inc. v. Reynolds.* ("Plaintiffs' Response" or "Pls.' Resp.").[1]

## I.

## PRELIMINARY STATEMENT

Plaintiffs' Response is a hodge-podge of unpersuasive arguments claiming that *Merck* requires this Court to deny Defendants' motion to dismiss. Plaintiffs argue that this Court originally applied a pure inquiry notice standard, even though this Court actually applied the same test that the Supreme Court approved in *Merck.* Plaintiffs further contend that the proper standard for assessing their claims should be whether a reasonable "mom and pop" investor would have discovered facts in support of their fraud claim, or whether a regulator has already commenced suit, even though *Merck* suggests nothing of the kind. And Plaintiffs claim that the filing of the *Corbi* complaint in July 2004 is of no significance, even though the CAC (i) makes essentially the same allegations of fraudulent conduct as *Corbi*, (ii) was signed by one of the same counsel of record as *Corbi*, and (iii) was brought on behalf of a

---

[1]   Plaintiffs' Response requests that the Court reverse its dismissal of their claims, implying that Plaintiffs are still pursuing the claims they brought under the Securities Act of 1933 (the "Securities Act"), not just the Securities and Exchange Act of 1934 (the "Exchange Act"). Pls.' Resp. 1, 3, 12. But the remainder of Plaintiffs' Response focuses only on the Exchange Act claims, repeatedly referring to the two-year statute of limitations that applies only to the Exchange Act. *See, e.g., id.* at 12-13. To the extent Plaintiffs intend to pursue their Securities Act claims, those claims should be dismissed for the reasons set forth in Defendants' Memorandum in Further Support of Their Motion to Dismiss Plaintiffs' Consolidated Amended Complaint ("CAC") ("Defs.' Br." or the "Opening Brief") 11-12, ECF No. 89.

1   class of plaintiffs nearly identical to the class in *Corbi*.  Plaintiffs' arguments are

2   meritless.

3      As our Opening Brief makes clear, this Court correctly applied the proper

4   standard.  Nothing in Plaintiffs' Response supports a different conclusion, and

5   dismissal of the CAC is warranted.

6   **II.**

7   **ARGUMENT**

8   **A.** **THIS COURT CORRECTLY APPLIED *MERCK*'S REASONABLY**

9      **DILIGENT PLAINTIFF STANDARD**

10      **1.** **Plaintiffs Blatantly Misconstrue This Court's Analysis,**

11        **Which Was Fully Consistent With *Merck***

12      Plaintiffs audaciously claim that "the inquiry notice standard rejected by

13   the Supreme Court in *Merck* served as the ***sole*** basis for this court's dismissal. . . ."

14   Pls.' Resp. 2 (emphasis added).  In doing so, Plaintiffs misleadingly quote a portion of

15   the Court's opinion where the Court merely summarizes one of Defendants' original

16   arguments.  Pls.' Resp. 2.  As Plaintiffs are well aware, this Court did not apply an

17   inquiry notice standard.  Rather, in its dismissal of the CAC, this Court expressly

18   applied the "inquiry-plus-reasonable-diligence test" adopted by the Ninth Circuit in

19   *Betz*, explaining that "[u]nder this test, a court first determines when the plaintiff had

20   inquiry notice of the facts giving rise to his securities claim. . . . '[T]he second stage of

21   [the] inquiry . . . . [asks] whether the plaintiff exercised reasonable diligence in

22   investigating the facts underlying the alleged fraud.'"  *In re Am. Funds Sec. Litig.*, 556

23   F. Supp. 2d 1100, 1103 (C.D. Cal. 2008) (citing *Betz v. Trainer Wortham & Co.*, 519

24   F.3d 863, 869 (9th Cir. 2008)), *vacated*, 2010 U.S. App. LEXIS 19403 (9th Cir. Sept.

25   17, 2010).

26      Thus, while this Court analyzed whether Plaintiffs were on inquiry

27   notice, it also addressed "the reasonable diligence prong," *i.e.* whether, "in the

28   exercise of reasonable diligence," Plaintiffs would have been aware of "the alleged

1   fraud scheme." *Am. Funds Sec. Litig.*, 556 F. Supp. 2d at 1110-11.  Unable to find

2   fault with this Court's actual analysis, Plaintiffs resort to mischaracterization.  This

3   Court's actual analysis was correct, and perfectly consistent with the test articulated in

4   *Merck*.

5            **2.**     ***Merck* Mandates That The Statute of Limitations Begins**

6                     **To Run When A Reasonably Diligent Plaintiff Would**

7                     **Have Discovered The Fraud**

8        In *Merck,* the Supreme Court stated plainly that the statute of limitations

9   for Section 10(b) claims begins to run once (i) a plaintiff did discover, or (ii) a

10   reasonably diligent plaintiff would have discovered, the facts constituting the

11   violation, *whichever comes first.  Merck & Co. v. Reynolds*, 559 U.S. __, 130 S. Ct.

12   1784, 1798 (2010).  Plaintiffs, however, attempt to invent a new standard by

13   suggesting that the court should use a "mom and pop" investor standard, or that the

14   statute runs only after an Attorney General or other governmental agency has filed suit

15   against the defendant. Pls.' Resp. 9-12.  This is not what the Supreme Court held in

16   *Merck*.

17        The *Benak* case Plaintiffs cite for their novel "mom and pop" investor

18   standard is entirely inapposite. *Id*. at 10. In *Benak*, plaintiffs alleged that a defendant

19   mutual fund adviser violated Sections 11 and 12 of the Securities Act by making

20   statements regarding its investment strategies that were materially misleading "in light

21   of the Fund's continued and increasing stake in Enron in the autumn of 2001." *Benak*

22   *v. Alliance Capital Mgmt. L.P.,* 435 F.3d 396, 399 (3d Cir. 2006).  The Third Circuit,

23   which applied the inquiry notice standard rejected by the Supreme Court in *Merck*,

24   held that mutual fund investors are expected to be on inquiry notice of facts disclosed

25   in news reports regarding the mutual fund they invest in, *i.e.*, the "primary investment

26   vehicle," but are not expected to have notice of facts regarding a company whose

27   stock happens to be held by the fund, *i.e.*, a "secondary relationship." *Id*. at 403.

28   Thus, news reports about Enron, a company whose stock was just one of many held by

1  the mutual fund at issue, were not sufficient on their own to put the plaintiffs in *Benak*

2  on inquiry notice of their Securities Act claims.  *Id.*  By contrast, the media accounts

3  *detailing that the fund held Enron stock*, however, *were* sufficient to put plaintiffs on

4  notice.  *Id.*

5          The news reports on which Defendants rely here are similar to the media

6  accounts in *Benak* that discussed the fund at issue rather than secondary information

7  (*i.e.*, regarding a company whose stock was held by the fund).  Here, the news reports

8  related to Plaintiffs' "primary investment vehicle," not to holdings in that vehicle.  *See*

9  Defs.' Br. Appx. A.  Plaintiffs therefore fail to point to *any* authority for the

10  proposition that a mutual fund investor plaintiff should be treated differently than a

11  standard "reasonably diligent plaintiff," and *nothing* in *Merck* suggests otherwise.

12          It would be inappropriate to treat Plaintiffs here any differently for a

13  second, entirely separate reason.  Cases like this purport to be brought on behalf of all

14  investors in a particular fund based on a presumption of reliance by the entire market.

15  *See* CAC  ¶¶ 116, 137-38.  There can be no justification for letting Plaintiffs plead one

16  element of a claim (reliance) based on what the market supposedly knew while

17  simultaneously claiming not to be bound by what the same market knew with respect

18  to another element of their claim (timeliness):  Plaintiffs that rely on the fraud-on-the-

19  market theory should not be permitted to pick and choose how it affects their claims.

20          Plaintiffs further attempt to distort *Merck*'s clear standard by repeatedly

21  claiming that the "best yardstick" for determining whether the facts underlying the

22  alleged violation could be discovered is "the amount of time it took the California

23  Attorney General's Office" to file suit against Defendants. Pls.' Resp. 9, 11-12.  But

24  *Merck* requires courts to focus on what a reasonably diligent plaintiff could discover,

25  not the time it takes a regulator—with a public duty to be thorough and act

26  prudently—to conclude an investigation and start a proceeding. *Merck,* 130 S. Ct. at

27  1798.  Plaintiffs' assertion that the California Attorney General's lawsuit should start

28  the running of the statute of limitations is misguided.  That the California Attorney

1  General chose to file suit against Defendants in early 2005 does not mean that a
2  private class action plaintiff could not have discovered facts supporting the alleged
3  fraud earlier.  Indeed, the filing of the *Corbi* complaint in July 2004 is uncontroverted
4  evidence that a reasonably diligent plaintiff *did* discover facts that led that plaintiff to
5  file a suit against Defendants alleging fraud.  *See* Defs.' Br. 8-10.

6  **B.**     **A REASONABLY DILIGENT INVESTOR WOULD HAVE**
7          **DISCOVERED THE FACTS CONSTITUTING THE VIOLATION**
8          **ALLEGED HERE BY JULY 2004 AT THE LATEST**

9          **1.     Plaintiffs Ignore That *Corbi* Demonstrates Precisely**
10                 **What a Reasonably Diligent Plaintiff Could Discover**

11          Plaintiffs suggest that Defendants rely on the *Corbi* complaint only for
12  the fact that it put Plaintiffs on notice of their claims here. Pls.' Resp. 5, 11.  While
13  *Corbi* was one of many sources that provided Plaintiffs with constructive notice of
14  their claims by July 2004 at the latest, *Corbi* is even more significant in that, as this
15  Court has already expressly found, it "*plainly demonstrates* what an investor
16  exercising reasonable diligence *in fact* accomplished." *Am. Funds Sec. Litig.*, 556 F.
17  Supp. 2d at 1111 (emphasis added).  In other words, *Corbi* is indisputable evidence of
18  when Plaintiffs here could have discovered the facts upon which their fraud claim is
19  based—had they exercised reasonable diligence.  Plaintiffs did not, and, therefore,
20  their claims should be dismissed.

21          Plaintiffs' attempts to distinguish the *Corbi* complaint from their CAC
22  are baseless.  *See* Pls.' Resp. 5.  For example, Plaintiffs claim that the *Corbi* complaint
23  neither "made a claim for securities fraud [n]or contained facts constituting scienter or
24  materiality."  *Id.*  That is simply incorrect.  Plaintiffs' Section 10(b) claim has a
25  statutory basis that is *identical* to one of the claims brought in *Corbi*.  *Compare* 15
26  U.S.C. § 80a-33(b) (making it unlawful "for any person to make any untrue statement
27  of a material fact in any . . . document filed or transmitted pursuant to [the Act]" or "to
28  omit to state therein any fact necessary in order to prevent the statements made therein

1   . . . from being materially misleading") *with* 17 C.F.R. § 240.10b-5(b) (making it

2   unlawful "[t]o make any untrue statement of a material fact or to omit to state a

3   material fact necessary in order to make the statements made, in the light of the

4   circumstances under which they were made, not misleading"). And the *Corbi*

5   complaint contained allegations of scienter *identical* to those in this case. Defs.' Br. 9,

6   Appx. A.

7            Plaintiffs' reliance on *Staehr v. Hartford Financial Services Group* is

8   unavailing. Pls.' Mem. 11. In this pre-*Merck* decision, the Second Circuit found that

9   a prior lawsuit filed against the defendant-insurer was not evidence of what plaintiff

10  could have discovered because the plaintiff in the earlier lawsuit was (i) "not an

11  investor of ordinary intelligence," (i) "a lawyer," and (iii) "affiliated with . . . a law

12  firm that touts its insurance law practice and is known for battling commercial

13  insurers." *Staehr v. Hartford Fin. Servs. Grp.*, 547 F.3d 406, 436 (2d Cir. 2008). The

14  earlier lawsuit was also filed in a state court on the other side of the country and "flew

15  under both industry and press radar screens." *Id.* at 418.

16           Here, by contrast, the named plaintiff in *Corbi* had no special expertise or

17  knowledge of the mutual find industry. The *Chin* plaintiffs are in the *same* position as

18  were the plaintiffs in *Corbi*. In addition, the CAC was (i) filed in the same court as

19  *Corbi*, (ii) signed by one of the same counsel of record as *Corbi*, and (iii) brought on

20  behalf of a class of plaintiffs nearly identical to the class in *Corbi*. *Compare* CAC ¶

21  117 *with* Complaint ¶ 29, *Corbi v. Capital Group Cos.,* No. CV 04-5593, 2009 U.S.

22  Dist. LEXIS 120597 (C.D. Cal. Dec. 28, 2009) (filed July 15, 2004), attached as

23  Exhibit A to the Declaration of Andrew Z. Edelstein submitted in connection with

24  Defendants' Motion to Dismiss the CAC, ECF No. 49 (hereafter, "Edelstein Decl.").

25  These facts are fatal to Plaintiffs' claims. Indeed, since *Merck* was decided, the

26  United States District Court for the District of Maryland has dismissed two complaints

27  under circumstances nearly identical to here—including the fact that the allegations

28  were the subject of a prior class action filed in the same court. *See Landsberger v.*

1   *Martek Biosciences Corp.*, No. CCB-09-3389, 2010 U.S. Dist. LEXIS 77260, at *10-

2   11 (D. Md. July 30, 2010); *Dale v. Martek Biosciences Corp.*, No. CCB-09-3124,

3   2010 U.S. Dist. LEXIS 77265, at *10-11 (D. Md. July 30, 2010) (same).

4   ## 2.   **Plaintiffs Had Constructive Notice of Scienter**

5   Plaintiffs claim that they adequately pleaded scienter by alleging that

6   Defendants engaged in "a persistent and deliberate scheme to conceal a thriving

7   system of kickbacks." Pls.' Opp. to Defs.' Mot. to Dismiss 5, ECF No. 54. Plaintiffs

8   further contend that they were not able to discover any facts regarding this purported

9   "scheme" until after the California Attorney General filed suit against Defendants in

10  early 2005. Pls.' Resp. 5-8. Plaintiffs analogize this case to *Merck*, where the

11  Supreme Court found certain "red flags" to be insufficient to trigger the running of the

12  statute of limitations. *See* Pls.' Resp. 3-4. Plaintiffs' analogy does not hold water.

13  In *Merck*, the defendant had repeatedly put forth a benign scientific

14  explanation for observations of an increased cardiovascular risk from its product

15  Vioxx—an explanation known as the "naproxen hypothesis." *Merck*, 130 S. Ct. at

16  1790-91. The plaintiffs in *Merck* alleged that Merck promoted the naproxen

17  hypothesis knowing that it was false, and that Vioxx did indeed present a health risk.

18  *Id.* at 1799. The prior "red flags" to which Merck pointed in support of its claim that

19  plaintiffs' claims were time-barred, however, were unrelated to the specific fraud

20  plaintiffs had alleged:

21  *First*, Merck's press release regarding a clinical study that suggested a

22  higher incidence of cardiovascular risks in Vioxx patients (the "VIGOR study") did

23  not, as Plaintiffs suggest, announce that Vioxx presented adverse cardiovascular risks.

24  Pls.' Resp. 4. Rather, the press release set forth for the first time Merck's "naproxen

25  hypothesis" and gave no indication that Merck was articulating the hypothesis falsely.

26  *Merck*, 130 S. Ct. at 1791.

27  *Second*, the February 2001 "public discussion" Plaintiffs point to was

28  nothing more than a meeting of the FDA's Arthritis Advisory Committee to discuss a

1    request by Merck to include a label on Vioxx that set forth certain positive

2    gastrointestinal effects from the drug. Pls.' Resp. 4; *Merck*, 130 S. Ct. at 1791. At

3    that meeting, the Committee also discussed the VIGOR study's cardiovascular

4    findings, but no evidence suggests that the Committee reached any conclusion

5    regarding the safety of Vioxx at that meeting. *Merck*, 130 S. Ct. at 1791.

6    *Third*, Plaintiffs point out that, in *Merck*, the Supreme Court was

7    unconvinced by the fact that prior plaintiffs had brought product liability suits

8    concerning Vioxx in May 2001 and September 2001. Pls.' Resp. at 4. But the reason

9    the Supreme Court was not persuaded by the existence of these suits was that the suits

10   did *not* contain "*any* specific information suggesting the fraud alleged here, *i.e.,* that

11   Merck knew the naproxen hypothesis was false even as it promoted it." *Merck*, 130 S.

12   Ct. at 1799 (emphasis added).

13   *Fourth*, the article in The Journal of the American Medical Association,

14   although it expressed concern about the results of the VIGOR study, did not conclude

15   the naproxen hypothesis was false or that Vioxx was unsafe, but only requested that

16   another study be conducted regarding cardiovascular risks associated with the drug.

17   *Id.* at 1791.

18   *Fifth*, the FDA warning letter, while accusing Merck of misleading

19   advertising concerning Vioxx, "*acknowledged that the naproxen hypothesis was a*

20   '*possible explanation' of the VIGOR results.*" *Id.* Thus, the Supreme Court expressly

21   stated that the FDA letter "*show[ed] little or nothing about the here-relevant scienter,*

22   *i.e., whether Merck advanced the naproxen hypothesis with fraudulent intent.*" *Id.* at

23   1799 (emphasis added).[2]

24   [2]  Plaintiffs further argue that unlike in *Merck*, there was no drop in share price here.

25   Pls.' Resp. 5. This is wholly irrelevant. The price of a mutual fund share is the

26   Fund's per-share Net Asset Value—or NAV—which is defined as the sum of the
     value of the fund's portfolio holdings, less any expenses or other liabilities, divided by

27   the number of shares outstanding. *See* 17 C.F.R. § 270.22c-1. Thus, because the price

28   of a mutual fund is based on the value of its holdings, disclosure of information about

(continued...)

Gibson, Dunn & Crutcher LLP

The "red flags" Merck pointed to were insufficient because they did not speak to the fraud the *Merck* plaintiffs alleged.  In stark contrast to *Merck*, there can be no doubt that information "about the here-relevant scienter" was discoverable by a reasonably diligent plaintiff more than two years before the CAC was filed.  Although Defendants dispute that the CAC adequately pleads scienter,[3] to the extent that any purported scheme existed, all information regarding the alleged scheme was disclosed by July 2004.[4]  Various news reports in the mainstream media, publicly disclosed SEC investigations, and the *Corbi* complaint were more than sufficient for a reasonably diligent plaintiff to discover all the purported bases for this fraud claim.  *See* Defs.' Br. 8-10, Appx. A.

Indeed, not only was the fraud alleged in this case *discoverable* by a reasonably diligent plaintiff, it allegedly *was discovered* by just such a plaintiff.  The

---

(...continued)

a fund does not affect its share price.  *See* Defs.' Mem. of P. & A. 13.  Indeed, courts have rejected securities fraud claims by mutual fund shareholders as a matter of law because the statutory pricing mechanism for fund shares precludes a finding of loss causation.  *See In re Morgan Stanley & Van Kampen Mut. Fund Sec. Litig.*, No. 03 Civ. 8208 (RO), 2006 WL 1008138, at *9 (S.D.N.Y. Apr. 18, 2006) ("This theory is incorrect as a matter of law . . . .  Plaintiffs explain no mechanism by which a mutual fund share's price could differ from its objective value."); *see also In re Salomon Smith Barney Mut. Fund Fees Litig.*, 441 F. Supp. 2d 579, 588-91 (S.D.N.Y. 2006); *In re Merrill Lynch Inv. Mgmt. Funds Sec. Litig.*, 434 F. Supp. 2d 233, 238-39 (S.D.N.Y. 2006).

[3]   *See* Defs.' Mem. of P. & A. 6-7, ECF No. 48.

[4]   Plaintiffs suggest that Defendants' defense that scienter was not adequately pleaded precludes them from arguing that facts sufficient to plead scienter were discoverable for purposes of the statute of limitations.  Pls.' Mem. 6.  As this Court noted at the November 8, 2010 status conference, Defendants' assertion that all facts constituting the purported violation were known or knowable no later than July 2004 "doesn't mean that the defendant has to concede scienter.  It just means that the facts upon which the plaintiff would allege or could conclude that scienter exists were known."  Rep.'s Tr. of Proceedings Held on Nov. 8, 2010, at 7.

1   *Corbi* complaint, filed in July 2004 by a plaintiff who was represented by one of the

2   same attorneys for Plaintiffs here, alleged that Defendants were engaged in the precise

3   scheme Plaintiffs here failed to assert until more than two years later in the CAC.

4   *Compare* Edelstein Decl. Ex. A ¶ 63 (alleging that CRMC "failed to disclose . . . (a)

5   that [it] authorized the payment from fund assets of excessive commissions to broker

6   dealers in exchange for preferential marketing services . . . ., (b) that [it] directed

7   brokerage payments to firms that favored American Funds . . . ., (d) that by paying

8   brokers to aggressively steer their clients to the American Funds, [it] was knowingly

9   aiding and abetting a breach of fiduciary duties, and profiting from the brokers'

10  improper conduct . . . ." *with* Pls.' Opp. to Defs.' Mot. to Dismiss 5-7 (citing CAC ¶¶

11  20-33).

12          The *Corbi* plaintiffs also alleged that Defendants were "engaging in a

13  deceptive contrivance, scheme, practice and course of conduct" **with scienter** by

14  "knowingly and/or recklessly engage[ing] in acts, transactions, practices, and course

15  of business which operated as a fraud upon the American Funds." Edelstein Decl. Ex.

16  A ¶ 89;  ¶¶ 108-09 (emphasis added) (asserting that CRMC "possessed actual or

17  constructive knowledge that the brokerages were breaching their fiduciary duties").

18  These allegations led this Court to conclude that "the allegations in the Chin

19  complaint are almost a verbatim copy of the allegations found in the Corbi complaint."

20  *Am. Funds. Sec. Litig.*, 556 F. Supp. 2d at 1109.  As set forth in Defendants' Opening

21  Brief and as this Court found, the *Corbi* complaint itself is evidence of what a

22  reasonably diligent plaintiff could discover. Defs.' Br. 8-10; *Am. Funds Sec. Litig.*,

23  556 F. Supp. 2d at 1111.[5]

24  _____

25  [5]   As this Court observed, "although the issue of diligence may not ordinarily be
    resolved as a matter of law on a motion to dismiss, the unusual record in this case
26  [including the filing of the *Corbi* complaint] allows for a determination of the question
    at this early stage of the proceedings." *Am. Funds Sec. Litig.*, 556 F. Supp. 2d at 1110.
27  In addition, two post-*Merck* cases dismissed complaints as time-barred on motions to
28  dismiss where a plaintiff previously had filed a similar complaint in the same court.

(continued...)

Gibson, Dunn &
Crutcher LLP

Numerous press articles in mainstream publications also disclosed the purported "scheme." In November 2003, *The Los Angeles Times* revealed that the SEC was investigating Defendants for paying "substantial hidden fees . . . in return for promoting their funds to investors over those offered by dozens of companies." Edelstein Decl. Ex. B at 1. In January 2004, *The Los Angeles Times* similarly revealed that Defendants were one of seven mutual fund managers that made revenue sharing payments to brokerage giant Edward Jones. *Id.* Ex. D at 3. In June 2004, *The New York Times* also noted the SEC's investigation of Defendants for "reward[ing] the brokerage firms that aggressively sold its funds by funneling commissions on securities trades chiefly to those firms." *Id.* Ex. E at 1. *The New York Times* added that "[s]uch a practice, known as directed brokerage, is a type of pay-to-play

---

(…continued)
*See Landsberger*, 2010 U.S. Dist. LEXIS 77260, at *10-11; *Dale*, 2010 U.S. Dist. LEXIS 77265, at *10-11. *Staehr*, which Plaintiffs cite in support of their claim that this Court cannot find the CAC time-barred on a motion to dismiss, bears no resemblance to the facts here—including the fact of the existence of the *Corbi* complaint. If anything, *Staehr* supports Defendants' position. *See Staehr,* 547 F.3d at 412 (noting courts can "readily resolve" statute of limitation questions as a matter of law on a motion to dismiss "where 'the facts needed for determination of when a reasonable investor of ordinary intelligence would have been aware of the existence of fraud can be gleaned from the complaint and papers . . . integral to the complaint.'").

*In re Bare Escentuals, Inc. Sec. Litig.*, also cited by Plaintiffs, is equally unavailing. The court in *Bare Escentuals* declined to determine whether the claims were time-barred at the motion to dismiss phase because, although defendants claimed that certain earlier press releases revealed the alleged fraud, plaintiffs asserted that the full extent of the fraud was not revealed until a later press release that was released within the limitations period. *In re Bare Escentuals, Inc. Sec. Litig.*, No. C 09-3268 PJH, 2010 U.S. Dist. LEXIS 103612, *73-74 (N.D. Cal. Sept. 30, 2010). Here, however, the earlier-filed *Corbi* complaint and news articles disclosed the full extent of the alleged fraud; in fact, the *Corbi* complaint showed exactly what a reasonably diligent plaintiff discovered regarding the purported scheme.

Gibson, Dunn & Crutcher LLP

1   arrangement that can represent a conflict of interest." *Id.*; *see also* Defs.' Br. Appx. A

2   (listing disclosures in numerous press articles).[6]

3           Plaintiffs' suggestion that Defendants' purported fraud was disclosed "in

4   a limited number of newspaper articles that made only passing reference to the

5   American Funds" and were not "readily accessible" is entirely inaccurate. Pls.' Mem.

6   5, 11. As this Court found, "the allegedly unlawful practices described in the CAC

7   were the subject of lengthy news articles in ***prominent national publications*** as much

8   as three years before the CAC was filed in this Court." *Am. Funds Sec. Litig.*, 556 F.

9   Supp. 2d at 1107 (emphasis added). In fact, two articles cited by Defendants are

10  *solely* about Defendants. Edelstein Decl. Exs. E-F.[7]

11          In addition, as this Court pointed out, in late 2003 and early 2004, the

12  practices that Plaintiffs allege constitute Defendants' purported "kickback scheme"

13  "were also the subject of SEC administrative proceedings . . . [that] were a matter of

14  public record." *Am. Funds Sec. Litig.*, 556 F. Supp. 2d at 1107. And, as this Court

15  noted, one of the SEC press releases asserted that these practices "violated Section

16  17(a)(2) of the Securities Act of 1933 [which] . . . prohibits the making of materially

17  misleading statements or omissions in the offer and sale of securities." *Id.* (citation

18  and quotations omitted).

19          Plaintiffs also argue that Defendants' denial of legal liability in certain

20  news articles prevented Plaintiffs from uncovering the alleged scheme here, likening

21  _____

22  [6]   That these articles revealed the SEC's investigation of Defendants plainly
    contradicts Plaintiffs' claim that "there was no governmental action against
23  Defendants" here as there was in *Merck.* Pls.' Resp. 5.

24  [7]   Plaintiffs' comparison of the articles in *Staehr* to those here is woefully inapt. *See*
25  Pls.' Mem. 11. In *Staehr*, the court found that four mainstream press articles, none of
    which referenced the defendant, and thirteen industry newsletters, only one of which
26  referenced the defendant, were not sufficient to put plaintiffs on inquiry notice
    because "[w]e have never affirmed the dismissal of a complaint as time-barred based
27  on a story that appeared only in a specialty publication." 547 F.3d at 427-28, 432.

28

Gibson, Dunn &
Crutcher LLP

Defendants' denials to Merck's concealment of the harmfulness of Vioxx.  Pls.' Resp. 6-8.  Plaintiffs are comparing apples and oranges.  Defendants' general *denials* of legal liability for actions that were fully disclosed are not in any way similar to Merck's alleged *concealment* of the harmfulness of Vioxx and assurances of its safety. Defendants stated only that they believed they were in compliance with the law when they concededly made and disclosed the payments at issue.  *See* Edelstein Decl. Ex. C at 1, Ex. D at 3.  Defendants never denied that it made the payments that are the subject of the CAC.  Merck, on the other hand, denied that Vioxx was in any way harmful.  *Merck*, 130 S. Ct. at 1791-92.  Thus, Defendants did not hide facts upon which a reasonably diligent plaintiff could rely in making an allegation of fraud, while Merck did.

### 3.   <u>Plaintiffs Had Constructive Notice of Materiality</u>

To the extent that the payments at issue were material,[8] Plaintiffs could have discovered what Plaintiffs claim is evidence of the materiality of the purported misstatements here.  Plaintiffs argue that they plead materiality by alleging that investors would not have acquired their shares in the funds if they knew that the aggregate amount of the purported "kickback" payments were "no less than $450 million."  Pls.' Opp. to Defs.' Mot. to Dismiss 13-14.

A reasonably diligent plaintiff could have discovered the approximate amount of Defendants' purportedly improper payments to brokers from a variety of sources prior to July 2004.  The *Corbi* plaintiffs purported to plead materiality by citing a January 2004 article in *The Wall Street Journal*, which reported that revenue sharing payments "varied between 0.05% and 0.04% of sales and up to 0.25% of assets that remained invested in the fund."  Edelstein Decl. Ex. A ¶ 56.  In addition, a

---

[8]   Like Plaintiffs' scienter allegations, Defendants dispute and do not concede that Plaintiffs adequately pled materiality simply by alleging the total amounts of payments to brokers.  *See* Defs.' Mem. of P. & A. 9-11; *see also supra* n.5.

Gibson, Dunn & Crutcher LLP

March 2004 prospectus for one of the American Funds—which Plaintiffs cite in the

CAC—revealed that the purportedly improper payments to dealers in the aggregate

"will equal approximately .02% of the assets of the American Funds" and "in no case

would [the payments] exceed the sum of (a) .10% of the previous year's fund sales by

that dealer and (b) .02% of assets attributable to that dealer." CAC ¶ 97. Simple

multiplication would provide a reasonably diligent plaintiff with facts upon which he

or she might allege materiality.[9]

### III.

### CONCLUSION

For the foregoing reasons and the reasons set forth in Defendants'

Opening Brief, the Court should once again dismiss the CAC in its entirety, with

prejudice, as time-barred.

DATED:  December 13, 2010                    GIBSON, DUNN & CRUTCHER LLP


                                             _____/s/ Gareth T. Evans_____
                                             GARETH T. EVANS
                                             ANDREW J. DEMKO
                                             333 S. Grand Avenue
                                             Los Angeles, CA 90071
                                             Telephone:  (213) 229-7734
                                             Facsimile:   (213) 229-6734

---

[9]   Other sources would have allowed Plaintiffs to estimate the materiality of the
purported misstatements as well.  For instance, the California Attorney General
disclosed that another mutual fund manager, which had significantly less assets under
management than Defendants, had paid approximately $79 million in purported
revenue sharing and directed brokerage payments.  Edelstein Decl. Ex. G at 2.
Numerous sources also disclosed that Merrill Lynch, also a smaller fund manager than
Defendants, had settled with the SEC for $50 million for engaging in the same
practices at issue here.  Plaintiffs could have deduced from this settlement that the
payments at issue were sizeable.  Edelstein Decl. Exs. B, C.

Gibson, Dunn &
Crutcher LLP

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MILBANK, TWEED, HADLEY
& McCLOY LLP
  JAMES N. BENEDICT
  SEAN M. MURPHY
  C. NEIL GRAY
One Chase Manhattan Plaza
New York, NY 10005-1413
Telephone:   (212) 530-5127
Facsimile:   (212) 530-5219

*Counsel for Defendants The Capital
Group Companies, Inc., Capital
Research and Management Company
and American Funds Distributors, Inc.*

## CERTIFICATE OF SERVICE

I, Geri D. Hollins, certify as follows:

I am employed in the County of Los Angeles, State of California; I am over the age of eighteen years and am not a party to this action; my business address is 2029 Century Park East, Los Angeles, California 90067, in said County and State.  I am employed in the offices of Gareth T. Evans, a member of the bar of this Court, and at his discretion on December 13, 2010, I served the following documents:

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' RESPONSE TO NOVEMBER 9, 2010 ORDER REGARDING UNITED STATES SUPREME COURT DECISION OF *MERCK & CO., INC. v. REYNOLDS*; and**

on the parties listed on the attached Service List, by the following means of service:

☑ **BY ELECTRONIC MAIL:**  I caused each such document to be transmitted by electronic mail, to the parties and electronic mail addresses indicated above.  The documents were served electronically and the transmission was reported complete and without error.

I am employed in the office of Gibson, Dunn & Crutcher LLP, and the foregoing document(s) was(were) printed on recycled paper.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on December 13, 2010            _____/s/_____
                                                                    Geri D. Hollins

100980006_1.DOC

1

# SERVICE LIST

*Attorneys for Defendants Capital Research and Management Company, American Funds Distributors, Inc. and Capital Group Companies Inc.*

MILBANK, TWEED, HADLEY & McCLOY LLP
James N. Benedict
Sean M. Murphy
C. Neil Gray
L. Anthony Pellegrino
Robert R. Miller
Andrew E. Tomback
One Chase Manhattan Plaza
New York, New York 10005
Telephone:    (212) 530-5000
Facsimile:    (212) 530-5219
E-Mail:        JBenedict@milbank.com
E-Mail:        SMurphy@milbank.com
E-Mail:        CNGray@milbank.com
E-Mail:        APellegrino@milbank.com
E-Mail:        ATomback@milbank.com

SONNENSCHEIN NATH & ROSENTHAL
Andrew Zachary Edelstein
601 South Figueroa Street
Suite 2500
Los Angeles, CA  90017-5704
Telephone:    (213) 892-5024
Facsimile:    (213) 623-9921
Email:        Andrew.edelstein@snrdenton.com

## *Plaintiffs' Co-Lead Counsel*

WEISS & LURIE
Joseph H. Weiss
Richard A. Acocelli
551 Fifth Avenue, Suite 1600
New York, New York 10176
Telephone:  (212) 682-3025
Facsimile:  (212) 682-3010
E-Mail:        JWeiss@weisslurie.com
E-Mail:        RAcocelli@weisslurie.com

WEISS & LURIE
Jordan Lurie
10940 Wilshire Blvd.
Suite 2300
Los Angeles, California 90024
Telephone:  (310) 208-2800
Facsimile:  (310) 208-2348
E-Mail:        JLurie@weisslurie.com

MILBERG LLP
Jeff S. Westerman
Sabrina S. Kim
300 S. Grand Ave., Ste. 3900
Los Angeles, California 90071
Telephone:  (213) 617-1200
Facsimile:  (213) 617-1979
E-Mail:      JWesterman@milberg.com
E-Mail:      SKim@milberg.com

MILBERG LLP
Jerome M. Congress
Janine L. Pollack
Anna C. Dover
One Pennsylvania Plaza
New York, New York 10119
Telephone:  (212) 594-5300
Facsimile:  (212) 868-1229
E-Mail:      JCongress@milberg.com
E-Mail:      JPollack@milberg.com
E-Mail:      ADover@milberg.com

*Plaintiffs Sabrina A. Chin and Consol Plaintiffs Rolf Basler Revocable Trust, Arden Geist and Rolf Basler*

GUTRIDE SAFIER
Adam Joshua Gutride
Seth A. Safier
Kate J. Stoia
835 Douglass Street
San Francisco, CA  94114
Telephone:  (415) 336-6545
Facsimile:  (415) 449-6469
E-Mail:      adam@gutridesafier.com
E-Mail:      seth@gutridesafier.com
E-Mail:      kstoia@gutridesafier.com

REESE RICHMAN LLP
Michael R. Reese
Kim E. Richman
875 Sixth Avenue, 18th Floor
New York, NY 10001
Telephone:  (212) 579-4625
Facsimile:  (212) 579-4272
E-Mail:      Michael@reeserichman.com
             Krichman@reeserichman.com

*Consol Plaintiffs Arden Geist, Edward Shaftan, and Sabrina A. Chin*

SCOTT & SCOTT LLP
Arthur L. Shingler, III
6424 Santa Monica Boulevard
Los Angeles, CA 90038
Telephone:  (213) 985-1274
Facsimile:  (213) 985-1278
E-Mail:      ashingler@scott-scott.com

1

*Plaintiff Sabrina A. Chin*

2

3 BROWER PIVEN APC
Charles J. Piven
1925 Old Valley Road
Stevenson, MD 21153
Telephone:    (410) 332-0030
Facsimile:    (410) 685-1300
E-Mail:        piven@browerpiven.com

4

5

6

7

8 *Consol Plaintiffs Rolf Basler Revocable Trust and Arden Geist*

9 LANGE & KONCIUS LLP
Jeffrey A. Koncius
Joseph Jude Lange
222 North Sepulveda Boulevard, #2000
El Segundo, CA 90245
Telephone:    (310) 414-1880
Facsimile:    (310) 414-1882
E-Mail:        jkoncius@lange-koncius.com
E-Mail:        jlange@lange-koncius.com

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28